# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Accredited Home Lenders Holding Co., *et al.*,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 09-11516 (MFW)<br><br>Jointly Administered |
| Wells Fargo Bank, N.A., solely in its capacity as Indenture Trustee and Property Trustee,<br><br>                  Plaintiff,<br><br>   v.<br><br>LSF5 Accredited Investments LLC, LSF5 Accredited Holdings LLC, Lone Star Fund V (U.S.) L.P., Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, Len W. Allen, Jr., Marc L. Lipshy, Catharon Miller, Leigh Rea, Michael D. Thomson and Benjamin D. Velvin, III,<br><br>                  Defendants. | <br><br>Adv. Pro. No. 09-53276 (MFW)<br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## PLAINTIFF'S AMENDED COMPLAINT

Wells Fargo Bank, N.A., solely in its capacity as Indenture Trustee and Property Trustee

("Wells Fargo" or "Plaintiff"), files this Amended Complaint against LSF5 Accredited

Investments LLC, LSF5 Accredited Holdings LLC, Lone Star Fund V (U.S.) L.P., Hudson

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are presumed to be jointly administered under the bankruptcy case and style referenced above.

Advisors LLC, Lone Star U.S. Acquisitions LLC, Len W. Allen, Jr., Marc L. Lipshy, Catharon Miller, Leigh Rea, Michael D. Thomson and Benjamin D. Velvin, III (collectively, "Defendants," "Lone Star Funds," or "Lone Star") and respectfully states:

### Introduction

This Complaint arises from the wrongful conduct of Lone Star Funds. In June of 2007, Lone Star agreed to purchase Accredited Home Lenders Holding Co. ("Accredited," "Debtor," or the "Company") for $15.10 a share after prevailing in a lengthy auction process involving several bidders. Shortly after entering into a merger agreement with Accredited, however, Lone Star implemented a deliberate scheme to purchase the Company for significantly less than the auction price. This scheme included making disparaging remarks about Accredited's financial condition in the public domain and publicly questioning Accredited's ability to continue as a going concern. Lone Star's plan also included withdrawing its offer to purchase the Company shortly before the acquisition of Accredited was scheduled to close. Lone Star's remarks and actions severely weakened Accredited and had the effect of driving away potential bidders for the Company. As a result, Accredited ultimately agreed to tender its shares for significantly less than $15.10 a share, saving Lone Star more than $100 million off the original auction price.

Lone Star's scheme to purchase Accredited for a discount did not end there, however. Lone Star engaged in additional wrongdoing after the acquisition of Accredited to ensure its costs for acquiring Accredited were minimized. The Indenture governing the Company's Junior Subordinated Notes had a change of control provision that required Accredited or Lone Star to repurchase those Notes if the Company was acquired and the acquisition was accompanied by a drop in the Company's credit rating of more than one "notch," as determined by Standard & Poor's. Because of Lone Star's pre-merger actions and disparaging remarks, this change of

control provision should have been triggered after Accredited's acquisition date and Lone Star should have been required to repurchase the Company's Junior Subordinated Notes. Lone Star took steps, however, to ensure it was not triggered.

Shortly after it acquired Accredited, Lone Star stopped disparaging the Company. Instead, Lone Star began singing Accredited's praises to anyone who would listen and indicated to Standard & Poor's and the Junior Subordinated Note Holders that Lone Star intended to inject hundreds of millions of dollars into Accredited to bolster its financial condition. Lone Star also proclaimed that it intended to remain in the sub-prime mortgage business with Accredited for the "long haul." As a result of Lone Star's representations, the Company's credit rating not only stabilized, it improved. Because of Accredited's improved rating, the change in control provision in the Indenture for the Junior Subordinated Notes was never triggered, and the Company and Lone Star were not required to repurchase the Notes when they clearly should have been required to do so.

Sadly, the Junior Subordinated Note Holders were left holding the bag. Contrary to Lone Star's representations, Lone Star did not inject the promised funds into Accredited and did not remain in the sub-prime lending business for the long haul.[2] Instead, shortly after receiving its improved credit rating, Accredited began avoiding its obligations and Lone Star began diverting the Company's funds to Lone Star's affiliates. Lone Star also caused Accredited to default on the Junior Subordinated Notes. As a result, Accredited was forced to file bankruptcy less than two years after it was acquired by Lone Star. Plaintiff files this adversary proceeding on behalf of the Junior Subordinated Note Holders to enforce their rights related to the Junior Subordinated Note Indenture and to recover monetary damages caused by Lone Star's wrongful conduct.

---

[2]   Certain affiliates of Lone Star may still have sub-prime related investments.

*Plaintiff*

1.      Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota. Wells Fargo is the Property Trustee (the "Property Trustee") for the Accredited Preferred Securities Trust I (the "Accredited Securities Trust"). Wells Fargo also serves as the Indenture Trustee (the "Indenture Trustee") under the Junior Subordinated Note Indenture governing the Company's Junior Subordinated Notes. Wells Fargo files this action in its capacity as the Property Trustee and the Indenture Trustee.

*Lone Star Defendants*

2.      Lone Star is a family of private equity funds that specialize in the acquisition of distressed assets, including distressed debt products related to single family residential loans. Since the establishment of their first fund in 1995, the principals of Lone Star have organized private equity funds totaling $24 billion.  The specific Lone Star Defendants in this case are as follows:

3.      Defendant LSF5 Accredited Investments LLC ("LSF5") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business in Dallas, Texas.  LSF5 is a direct subsidiary of Defendant LSF5 Accredited Holdings LLC.

4.      Defendant LSF5 Accredited Holdings LLC ("LSF5 Holdings") is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Dallas, Texas.  LSF5 Holdings is a direct subsidiary of Defendant Lone Star Fund V (U.S.) L.P.

5.      Defendant Lone Star Funds V (U.S.) L.P. ("Fund V") is a limited partnership organized under the laws of the State of Delaware with a principal place of business in Dallas,

Texas. Fund V is the owner of the majority of the membership interests of LSF5 Holdings.

6.    Defendant Hudson Advisors LLC ("Hudson") is a limited liability company organized under the laws of the State of Texas with a principal place of business in Dallas, Texas.  Hudson is the asset manager for Fund V and LSF5 and numerous other Lone Star affiliates.

7.    Defendant Lone Star U.S. Acquisitions LLC ("U.S. Acquisitions") is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Dallas, Texas.

8.    Defendant Len W. Allen, Jr. ("Allen") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates.  Allen is a citizen of Texas.

9.    Defendant Marc L. Lipshy ("Lipshy") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates.  Lipshy is a citizen of Texas.

10.    Defendant Catharon Miller ("Miller") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates.  Miller is a citizen of Illinois.

11.    Defendant Leigh Rea ("Rea") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates.  Rea is a citizen of Texas.

12.     Defendant Michael D. Thomson ("Thomson") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates.  Thompson is a citizen of Texas.

13.    Defendant Benjamin D. Velvin, III ("Velvin") is a former director of Accredited and officer and/or director of multiple Lone Star affiliates. Velvin is a citizen of Texas. (LSF5, LSF5 Holdings, Fund V, Hudson, U.S. Acquisitions, Allen, Lipshy, Miller, Rea, Thomson and Velvin are referred to collectively herein as "Lone Star," "Lone Star Funds," or "Defendants.")

**Jurisdiction and Venue**

14.     This adversary proceeding relates to the bankruptcy case styled *Accredited Home Lenders Holding Co. et al.*, pending before the United States Bankruptcy Court for the District of Delaware under Chapter 11 at case number 09-11516 (MFW).  The Court has jurisdiction to hear this matter under 28 U. S. C. § 1334(b).  Venue is proper in the District of Delaware under 28 U. S. C. § 1409 and 28 U. S. C. § 1391.  Personal jurisdiction exists over the Defendants in this district because the Defendants are incorporated in and/or organized under the laws of Delaware, are officers and/or directors of Delaware entities or have the sufficient minimum contacts under Bankruptcy Rule of Procedure 7004 to be sued in Delaware.  This is a non-core proceeding and, by virtue of Plaintiff's demand for a jury trial, Plaintiff does not consent to this Court entering final orders or judgments.

**Factual Background**

15.     Accredited was founded in San Diego, California in 1990.  Through its subsidiaries, Accredited engaged in the business of originating, financing, securitizing, servicing, and selling residential mortgages that do not conform to the credit and other lending criteria established by Fannie Mae and Freddie Mac.  These mortgages are often referred to as "sub-prime" or "non-prime" loans.  Following its creation in 1990, Accredited grew to become one of the nation's premier mortgage banking institutions.  In 2003, the Company went public and its initial public offering was the NASDAQ's best-performing IPO that year.  At its peak in 2006, Accredited originated in excess of $2 billion in residential home mortgages and had over 2,500 employees.

16.     In January of 2007, the Company issued $56 million of Junior Subordinated Notes (the "Notes" or the "Subordinated Notes") through the Accredited Securities Trust. Interest on the Notes was due in quarterly installments at a fixed rate of 9.01% per annum until January 30, 2012.  Thereafter, interest accrued at the variable rate of LIBOR plus 3.95% to be adjusted quarterly.  The stated maturity date for the Notes was January 30, 2037.

17.     The Indenture for the Subordinated Notes also had a "change of control" provision that required Accredited (or a potential acquirer of Accredited) to buy back the Notes if the Company was acquired and the acquisition was accompanied by a drop in the Company's credit rating of more than one "notch."  Under the terms of the Indenture, Standard and Poor's ("S&P") was the ratings organization designated to determine Accredited's credit rating. Pursuant to an engagement agreement with the Note Holders, the Note Holders were required to pay for S&P's services and S&P was acting at the direction of the Note Holders.  Upon completion of the ratings affirmation process, S&P was required to communicate the Company's credit rating to the Note Holders by way of a private letter rating.  The private letter rating was not intended for publication.

18.     Shortly after issuing the Notes, Accredited announced that it was experiencing certain liquidity problems due to the various events that had plagued the sub-prime industry since the end of 2006.  In order to resolve these problems, Accredited retained a leading investment bank and financial advisory firm to advise the Company of its strategic options and to assist it with its liquidity needs.  Soon thereafter, the Company embarked on a multi-tiered strategy to improve its liquidity.

19.     On March 16, 2007, the Company announced the sale of substantially all of its existing loan portfolio for $2.7 billion and also announced that it would seek waivers of certain

debt covenants from its lenders to prevent covenant defaults under its existing credit facilities. On March 20, 2007, the Company announced that it had entered into a commitment letter for a $200 million term loan with Farallon Capital Management. This facility gave Farallon the option to purchase $3.23 million of the Company's shares at a price of $10.00 per share. The term loan was eventually funded in the increased amount of $230 million. Finally, the Company announced that it had instructed its financial advisory firm to begin searching for a strategic partner to assist it in optimizing its business strategy. Sixty-three (63) parties expressed an initial interest in the Company. One of those parties was Lone Star Funds.

20.     On March 27, 2007, Lone Star and Accredited began discussing the possibility of a merger transaction. That same day, Lone Star was given access to a virtual data room created by the Company. Lone Star was also given access to the Company's management and personnel. In fact, Accredited created financial forecasts and projections for the Company at the direction of Lone Star and its financial professionals. The assumptions used in the models created by Accredited were also supplied by Lone Star. When Lone Star and Accredited began merger discussions, the Company's S&P credit rating was B-.

21.     Believing there could be many synergistic benefits from an acquisition of Accredited, Lone Star began aggressively pursuing a plan to acquire Accredited for a discount. Shortly after completing its preliminary due diligence of the Company, Lone Star made an initial bid to acquire the Company for approximately $8 per share. Several subsequent bids followed, and by April 17, 2007, Lone Star was one of only six bidders left in the running for Accredited. By this time, however, multiple bidders had bid over $10 a share for the Company. Undeterred by the increase in the bidding price, Lone Star continued bidding against the six remaining participants. Lone Star's persistence paid off. By May 9, 2007, Lone Star was one of only two

bidders left in the running for Accredited, and the Company and Lone Star began exchanging legal documents in hopes of reaching a definitive merger agreement.

22.     On May 20, 2007, Lone Star forwarded to Accredited Lone Star's proposed revisions to the Company's Draft Agreement and Plan of Merger. Over the next two weeks, lawyers from Accredited and Lone Star attempted to reach a final merger agreement. During this time, Lone Star, its financial advisors and accounting professionals continued their investigation of Accredited, including conducting a considerable amount of due diligence at the Company.

23.     With two bidders still in the running for Accredited, Lone Star increased its bid yet again. On June 1, 2007, Lone Star bid $13.25 a share for the Company. This spurred a long evening of competitive bidding, with Lone Star ultimately prevailing at a bid of $15.10 per share.

24.     On June 4, 2007, Accredited and Lone Star entered into a definitive merger agreement (the "Merger Agreement" or the "Agreement"). The Agreement contemplated the acquisition of Accredited through a public tender offer for Accredited's shares and a subsequent merger with a Lone Star affiliate. The Merger Agreement was also negotiated in the midst of the downturn in the sub-prime industry and specifically included a "Material Adverse Effect" provision that prevented Lone Star from withdrawing from the Agreement for, among other reasons, adverse changes in the capital markets, U.S. economy or world economy.

25.     After executing the Merger Agreement on June 4, 2007, Lone Star and Accredited issued a joint press release announcing the transaction. The press release clearly reflected Lone Star's confidence in Accredited's ability to continue as a going concern:

> We share the Accredited team's vision for the Company and their diversified approach to the non-prime market. ***With our additional experience and capital, we are confident that Accredited can successfully manage through the current industry dynamics and leverage the platform***.

(*See* Press Release announcing Lone Star's acquisition of Accredited, attached as Exhibit "1") (emphasis added). On that same day, Lone Star filed a tender offer statement with the SEC indicating its long-term commitment to Accredited and its management team:

> This transaction means that Accredited can go forward with its business as before, ***but with greater access to capital and resources for the future. Lone Star has stated that one of their highest priorities is the retention of Accredited's superior management, staff and culture***. This means Accredited can go forward with its business as before, enhanced by the strong capital base of Lone Star.

(*See* Tender Offer Statement filed by Lone Star, attached as Exhibit "2") (emphasis added).

26.     On June 19, 2007, Lone Star commenced its tender offer by filing with the SEC a Schedule TO along with an Offer to Purchase and related documents. Lone Star's offer to purchase the Company's shares was scheduled to expire at midnight on July 17, 2007, but Lone Star extended this deadline to July 31, 2007. Prior to July 31, 2007, Lone Star extended the deadline to tender the Company's shares to August 14, 2007.

27.     At the time of the tender offer statement and joint press release, Lone Star and its professionals had conducted over two months of due diligence on Accredited and reviewed virtually every legal, financial and accounting document in the Company's possession. Lone Star had also conducted a substantial amount of on-site due diligence, which included interviewing the Company's management and staff members on several occasions. During this time, Lone Star became intimately familiar with the Company's capital structure and credit facilities, including the Indenture for the Company's Junior Subordinated Notes and the Indenture's change of control provision.

28.     After the Merger Agreement was signed, Lone Star continued its due diligence of Accredited, which appeared to proceed without incident. On August 10, 2007, however, Lone

Star reversed course. Lone Star sent a letter to the Chairman of the Special Committee for the Company's board of directors appointed to review the Lone Star acquisition and withdrew Lone Star's offer to acquire the Company. As justification for its withdrawal, Lone Star cited the Company's purported recent and rapid financial deterioration. Significantly, the letter was sent more than four months after Lone Star began its due diligence of the Company. On that same day, Lone Star also amended its Schedule TO filed with the SEC to include Lone Star's communication with Accredited's Special Committee Chairman. This public disclosure put increasing pressure on Accredited's shares and spurred rumors throughout the industry that Accredited was headed for bankruptcy or would otherwise cease operations.

29.     With its share price plummeting and few going forward options remaining, Accredited sued Lone Star in Delaware Chancery Court seeking specific performance of the Merger Agreement. The lawsuit was filed one day after Lone Star's disparaging public remarks were made. Lone Star filed an Answer to Accredited's Complaint ten days later. The Answer continued Lone Star's barrage on Accredited's financial viability and contained numerous disparaging remarks that questioned Accredited's financial condition and its ability to continue as a going concern. Because the public perceived Lone Star's comments to be those of an informed insider, any intrinsic value that Accredited had in the marketplace was severely diminished and its going forward options were severely limited. By this time, Accredited's S&P credit rating had dropped to CCC-. This was more than one notch lower than S&P's B- rating of Accredited before the Lone Star transaction was announced.

30.     On August 30, 2007, Lone Star publicly disclosed that it had made a revised tender offer to Accredited's board seeking to purchase the Company's shares for $8.50 per share. In conjunction with this offer, Lone Star publicly released the letter to Accredited's board

conveying the offer. The letter reiterated Lone Star's pessimistic view of the Company and continued to question Accredited's ability to survive as a going concern unless it was acquired by Lone Star. Lone Star's $8.50 offer was nearly 40% less than Lone Star had agreed to pay for the Company's shares under the terms of the Merger Agreement and significantly less than other bidders were willing to pay for Accredited during the Company's auction.

31. Left with few options and unable to engage in protracted litigation with Lone Star, the Company agreed to settle with Lone Star for considerably less than the $15.10 a share auction price. On October 12, 2007, the Company announced that it had agreed to tender its shares to Lone Star for $11.75 a share, saving Lone Star more than $100 million off the price Lone Star originally agreed to in the Merger Agreement. Shortly thereafter, Lone Star fired most of the Company's senior management, essentially reneging on its pledge to retain the Company's management and culture. Lone Star also replaced six of the Company's eight existing directors with directors that were either employed by Lone Star or that were beholden to it. This was merely the beginning of Lone Star's pervasive domination and control of the Company, its management and its employees.

32. Shortly after Lone Star's acquisition of the Company, the Junior Subordinated Noteholders asserted their rights under the Indenture to institute a ratings affirmation process of Accredited, and S&P began reviewing financial information provided by the Company and Lone Star for that purpose. Under the terms of the Indenture, the Company would be required to repurchase the Notes if its CCC- credit rating did not improve as that rating was more than one notch below the Company's B- rating before the announcement of the Company's acquisition by Lone Star.

33.     Realizing that any savings that it obtained by re-trading the Company's acquisition price could be eviscerated by the requirement to buy back the Subordinated Notes, Lone Star quickly shifted its focus to manipulating the credit ratings process with S&P.  This manipulation was facilitated through a two-part strategy.  First, rather than disparage Accredited as it had done a month earlier, Lone Star made favorable comments about Accredited in the public domain and indicated that it intended to remain in the sub-prime business with Accredited for the "long haul."  These comments were made to financial institutions, stock analysts and other members of the sub-prime community.  Lone Star also made favorable comments about Accredited in its public filings.

34.     Second, Lone Star and Accredited represented to both the Note Holders and S&P that Lone Star intended to support the Company through periodic and substantial capital contributions.  For example, when asked during the credit ratings process if Lone Star was going to guarantee the Junior Subordinated Notes, Stuart Marvin (Accredited's Executive Vice President and Secretary) indicated to S&P and the Note Holders on January 15, 2008, that Lone Star would not directly guarantee Accredited's obligations under the Notes but would indirectly guarantee payments on the Notes through future capital contributions to Accredited.   In a March 4, 2008 email to S&P and the Note Holders, Lone Star also confirmed its purported long-term commitment to Accredited and its intention to support Accredited with future capital contributions:

> The only equity investor in Accredited Home Lenders is Lone Star Funds.  Since October 2007, Lone Star has purchased all the common stock of Accredited for approximately $315 million and contributed $100 million in additional capital into the company beyond their initial purchase of the company's common stock.
>
> Lone Star Funds is a private equity firm focused on opportunistic investment strategies, especially in out-of-favor classes during

> periods of limited liquidity. ***Lone Star's involvement in Accredited represents a critical part of Lone Star's long-term domestic mortgage investment strategy that is based on the long term viability of the residential mortgage market and Accredited's superior underwriting and servicing***.

(*See* March 4, 2008, email from Lone Star to S&P and the Note Holders attached as Exhibit "3") (emphasis added). Before representing Lone Star's intentions to support Accredited with significant future capital contributions, Mr. Marvin indicated that he was speaking on behalf of Lone Star and would be acting at the direction of Lone Star's officers, including Allen, Lipshy, Miller, Rea, Thompson and Velvin during the credit ratings process. Mr. Marvin's remarks and conduct during the credit ratings process were also authorized by John P. Grayken, a principal of Lone Star Funds.

35. Finally, Lone Star and Accredited submitted a 5-year financial plan to S&P and the Note Holders that represented that Lone Star would make significant capital contributions to Accredited during the 2008 calendar year and beyond. Specifically, the 5-year plan called for capital infusions of $80 million in June 2008, $25 million in July 2008, $20 million in August 2008, $30 million in September 2008, $10 million in October 2008, $15 million in November 2008 and $5 million in December 2008. (*See* Lone Star's and Accredited's Five Year Plan, attached as Exhibit "4"). On May 14, 2008, the Debtor and officials from Hudson explained Lone Star's 5-year plan to S&P via conference call and conveyed Lone Star's intention to make the capital contributions provided for in the 5-year plan. Before submitting the 5-year plan to S&P and the Note Holders, LSF5, LSF5 Holdings, Fund V, Hudson, U.S. Acquisitions, Allen, Lipshy, Miller, Rea, Thompson and Velvin reviewed the 5-year plan and contributed to its creation. These individuals and entities also knew that Lone Star had no intention of making the capital

contributions called for in the 5-year plan at the time the 5-year plan was submitted to S&P and the Note Holders.

36.     The $185 million in capital contributions called for in the first 6 months of Lone Star's 5-year plan essentially echoed Lone Star's oral representations to S&P and the Note Holders that it had $200 million in "dry powder" to contribute to Accredited during 2008. This false representation was made on November 1, 2007 on a conference call that the Note Holders, S&P, the Debtor and U.S. Acquisitions attended. During this call the Debtor and the Lone Star affiliates in attendance not only indicated that Lone Star would inject $200 million into Accredited during the calendar year 2008, they also indicated that they would contribute additional funds into Accredited as needed to maintain Accredited's liquidity.

37.     Lone Star's manipulation of the ratings process was not limited to making false representations to the Note Holders and S&P. Lone Star omitted a number of material facts that would have undoubtedly altered the credit ratings process if disclosed and ultimately lowered S&P's private credit rating for the Company. For example, Lone Star failed to disclose to S&P and the Note Holders in March of 2008 that the Company's auditors were in the process of issuing an audit report for Accredited that contained a "going concern" qualification for calendar year 2008, but did not do so because LSF5 and Hudson falsely indicated that Lone Star Funds would provide considerable financial support to Accredited during the year 2008. This false representation and omission was made with the full knowledge and consent of Fund V, LSF5 Holdings, U.S. Acquisitions, Allen, Liphsy, Miller, Rea, Thompson and John P. Grayken. During the credit ratings process, the Defendants also failed to disclose that at least one of their largest affiliates (Bruno's Holdings LLC) was experiencing severe liquidity problems, had suffered considerable operating losses and could not continue to operate without significant

capital contributions from Lone Star Funds or its affiliates. The Defendants additionally failed to disclose that Lone Star Funds and its affiliates likely would have hundreds of millions of dollars of legal exposure in connection with their operation and oversight of Bruno's. (A complaint filed by the liquidating trustee for Bruno's Holdings LLC detailing this exposure is attached as Exhibit "5"). Significantly, Lone Star Funds also did not disclose any of these material facts in its public filings related to the capital raised for Lone Star Fund VI, which undoubtedly would have had a negative impact on that effort and S&P's credit rating of Accredited.

38.     Based on Lone Star's and Accredited's false representations and omissions, the Company's credit rating not only stabilized, it improved. On May 23, 2008, S&P issued a B- credit rating for Accredited. Indeed, had it not been for Lone Star's false representations and omissions as well as the proffer of its 5-year plan, the Company's S&P credit rating would have decreased below CCC- as the Company was required to expend $230 million to retire the Farallon Capital term loan. Retirement of the term loan was necessitated by a change in control provision in that facility.

39.     Unfortunately, Lone Star's repeated assurances of financial support did not materialize. Lone Star did not make the majority of contributions it promised in its 5-year plan. In fact, through its complete domination and control of Accredited's affairs, it appears that Lone Star began diverting the Company's already limited capital resources to Lone Star's affiliates rather than allowing Accredited to fulfill its financial obligations. This may explain why Accredited began defaulting on many of those obligations shortly after receiving its improved credit rating from S&P when Lone Star's 5-year plan projected the Company would be flush with cash in 2008 and beyond.[3] Indeed, Accredited defaulted on the Junior Subordinated Notes

---

[3]     Upon information and belief, Accredited had retained counsel and considered filing bankruptcy around the time it received a B- rating from S&P.

in January of 2009 and the default was never cured.  As a result, Accredited was forced to file for bankruptcy in May of 2009.

40.  Had Lone Star injected the $180 million in 2008 reflected in its 5-year plan, Accredited's situation would have been much different.  It is clear that Lone Star created financial projections sufficient to avoid a credit rating downgrade, but that Lone Star had no intention of actually making the capital contributions necessary to support that rating.  This resulted in the Company and Lone Star wrongfully avoiding their obligations to repurchase the Junior Subordinated Notes and caused considerable monetary damages to the Junior Subordinated Note Holders.

<u>**Causes of Action**</u>[4]

<u>*Fraudulent Misrepresentation*</u>
**(Count I)**

41.  Plaintiff re-alleges the allegations in paragraphs 1 through 40 as if they were set forth in full.

42.  The Indenture for the Junior Subordinated Notes had a change in control provision that required the Company or Lone Star to repurchase the Notes if the Company was acquired and the acquisition was accompanied by a credit ratings downgrade of more than one notch as determined by S&P.  At the time of Lone Star's acquisition of Accredited, the Company's S&P credit rating was CCC-.  This was more than one notch below the Company's B- rating at the time Lone Star's acquisition was announced.  Under the terms of the Indenture for the Junior Subordinated Notes, the Company or Lone Star would have been required to buy back the Notes unless it received an improved credit rating at the conclusion of the ratings affirmation process described above.  During the ratings affirmation process (which was

---

[4]  Counts I through V are asserted against all Defendants.

conducted exclusively for the benefit of the Note Holders) Lone Star intentionally made false and misleading representations or intentionally omitted material information that made Lone Star's representations false and misleading. Lone Star's false representations and omissions were made to S&P and the Note Holders for the specific purpose of manipulating the ratings affirmation process and for the purpose of obtaining an improved credit rating for Accredited. The specific false representations made by Lone Star are described with more particularity above but include materially false representations in Lone Star's 5-year plan representing that Lone Star intended to make $185 million in capital contributions to Accredited during the calendar year 2008. Lone Star's intentional false and misleading representations also include falsely representing to S&P and the Note Holders during the ratings affirmation process that Lone Star was committed to the long-term survival of Accredited when Lone Star's actions immediately following the credit affirmation process clearly demonstrate that Lone Star was most certainly not. Lone Star was also aware that the information supplied by it and the statements made by it would be used and/or considered for the specific purpose of assigning a credit rating to Accredited after the Company was acquired by Lone Star as required by the Indenture for the Junior Subordinated Notes. S&P and the Note Holders reasonably relied on Lone Star's intentionally false and misleading representations or omissions to the Note Holders' detriment. But for Lone Star's intentional and false representations and omissions, S&P would have issued the Company a CCC- credit rating or lower. This would have required the Company or Lone Star to repurchase the Notes. As a direct and proximate result of Lone Star's intentional and misleading omissions and representations, the Note Holders sustained significant damages. Lone Star's false representations and omissions were made intentionally and willfully, with a

conscious disregard for the rights of the Note Holders, thereby warranting an award of exemplary damages.

*Negligent Misrepresentation*
**(Count II)**

43.    Plaintiff re-alleges the allegations in paragraphs 1 through 42 as if they were set forth in full.

44.    The Indenture for the Junior Subordinated Notes had a change in control provision that required the Company or Lone Star to repurchase the Notes if the Company was acquired and the acquisition was accompanied by a credit ratings downgrade of more than one notch as determined by S&P.  At the time of Accredited's acquisition, the Company's S&P credit rating was CCC-.  This was more than one notch below the Company's B- rating at the time Lone Star's acquisition was announced.  Under the terms of the Indenture for the Junior Subordinated Notes, the Company or Lone Star would have been required to buy back the Notes unless it received an improved credit rating at the conclusion of the ratings affirmation process described above.  During the ratings affirmation process (which was conducted exclusively for the benefit of the Note Holders) Lone Star unintentionally and/or negligently supplied false and misleading information to S&P and the Note Holders or unintentionally and/or negligently failed to provide information to S&P and the Note Holders that made the information Lone Star provided false and misleading.  Lone Star's actions resulted in the Company receiving a B- S&P rating when the rating should have been CCC- or lower.  The specific false representations and misleading statements made by Lone Star are more fully described above but include materially false and misleading representations in Lone Star's 5-year plan representing that Lone Star would make $185 million in capital contributions to Accredited during the calendar year 2008. Lone Star's false and misleading representations also included falsely representing to S&P and

the Note Holders during the ratings affirmation process that Lone Star was committed to the long-term survival of Accredited when Lone Star's actions immediately following the credit affirmation process demonstrate a lack of support. The misleading and false statements made by Lone Star and/or the misleading and false information used to support those statements were made and supplied to S&P and the Note Holders by Lone Star in the ordinary course of Lone Star's business as Lone Star is accustomed to providing financial information to third parties for similar purposes. Lone Star was also aware that the information supplied by it and the statements made by it would be used and/or considered for the specific purpose of assigning a credit rating to Accredited after the Company was acquired by Lone Star as required by the Indenture for the Junior Subordinated Notes.

45. When making the representations and omissions described above or when supplying the information used to support Lone Star's misrepresentations or omissions, Lone Star did not act with ordinary care. S&P and the Note Holders reasonably relied on Lone Star's false and misleading representations to the Note Holders' detriment. But for Lone Star's unintentional but false representations and omissions, S&P would have issued the Company a credit rating of CCC- or lower. This would have required the Company or Lone Star to repurchase the Notes. As a direct and proximate result of Lone Star's negligent representations and omissions, the Note Holders sustained significant damages.

### *Tortious Interference with Contract*
### (Count III)

46. Plaintiff re-alleges the allegations in paragraphs 1 through 45 as if they were set forth in full.

47. The Junior Subordinated Notes and the Indenture for the Junior Subordinated Notes were valid and existing contracts before Lone Star acquired Accredited and at the time of

Accredited's acquisition. Lone Star was aware of those contracts through its participation in the ratings affirmation process required by the Indenture and because of Lone Star's extensive due diligence of the Company before Lone Star's acquisition of Accredited. By causing the Company to supply false or misleading information to S&P and the Note Holders, by preventing the Company from providing true and accurate information on a timely basis during the ratings affirmation process and by causing the Company to default on the Notes after obtaining a B-credit rating from S&P, Lone Star intentionally induced Accredited to breach its obligations under the Junior Subordinated Notes and the Indenture for the Junior Subordinated Notes. Alternatively, Lone Star intentionally interfered with Accredited's contractual obligations under the Indenture and the Subordinated Notes or made those obligations more difficult or impossible to perform. Lone Star's interference was not justified as it was facilitated through fraud and because the interests of Accredited and Lone Star were not aligned at the time of Lone Star's wrongful conduct. As a direct and proximate result of Lone Star's conduct, the Note Holders suffered significant damages. Lone Star's conduct was undertaken willfully and maliciously, with a conscious disregard for the rights of the Note Holders, thereby warranting an award of exemplary damages.

*Promissory Estoppel*
**(Count IV)**

48.     Plaintiff re-alleges the allegations in paragraphs 1 through 47 as if they were set forth in full.

49.     The Indenture for the Junior Subordinated Notes had a change in control provision that required the Company or Lone Star to repurchase the Notes if the Company was acquired and the acquisition was accompanied by a credit ratings downgrade of more than one notch as determined by S&P. At the time of Lone Star's acquisition of Accredited, the

Company's S&P credit rating was CCC-. This was more than one notch below the Company's B- rating at the time Lone Star's acquisition was announced. Under the terms of the Indenture for the Junior Subordinated Notes, the Company or Lone Star would have been required to buy back the Notes unless it received an improved credit rating at the conclusion of the ratings affirmation process described above. During the ratings affirmation process (which was conducted exclusively for the benefit of the Note Holders) Lone Star intentionally made false and misleading representations or promises to S&P and the Note Holders or intentionally omitted material information that made Lone Star's promises and/or representations to S&P and the Note Holders false and misleading. Lone Star's false representations and/or promises and omissions were made to S&P and the Note Holders for the specific purpose of manipulating the ratings affirmation process and for the purpose of obtaining an improved credit rating for Accredited. The specific false representations and/or promises and omissions made by Lone Star are described with more particularity above but include materially false representations and promises in Lone Star's 5-year plan representing that Lone Star intended to make $185 million in capital contributions to Accredited during the calendar year 2008. Lone Star's intentional false and misleading promises and/or representations also include falsely representing and/or promising to S&P and the Note Holders during the ratings affirmation process that Lone Star was committed to the long-term survival of Accredited when Lone Star's actions immediately following the credit affirmation process clearly demonstrate that Lone Star was most certainly not. Lone Star was also aware that the information supplied by it and the statements made by it would be used, considered and/or relied upon for the specific purpose of assigning a credit rating to Accredited after the Company was acquired by Lone Star as required by the Indenture for the Junior Subordinated Notes. S&P and the Note Holders justifiably and reasonably relied on Lone Star's

intentionally false and misleading promises and/or representations or omissions to the Note Holders' detriment. But for Lone Star's intentional and false promises and/or representations and omissions, S&P would have issued the Company a CCC- credit rating or lower. This would have required the Company or Lone Star to repurchase the Notes. As a direct and proximate result of the Note Holder's reliance on Lone Star's intentional and misleading promises and/or representations and omissions, the Note Holders sustained significant damages. Injustice can only be avoided by enforcement of Lone Star's promises and/or requiring Lone Star to repurchase the Notes.

<em>Unjust Enrichment</em><br>
<strong>(Count V)</strong>

50.     Plaintiff re-alleges the allegations in paragraphs 1 through 49 as if they were set forth in full.

51.     The Indenture for the Junior Subordinated Notes had a change in control provision that required the Company or Lone Star to repurchase the Notes if the Company was acquired and the acquisition was accompanied by a credit ratings downgrade of more than one notch as determined by S&P. Lone Star was aware of the existence of the Indenture for the Junior Subordinated Notes, and its change in control provision, at the time it acquired Accredited. At the time of the acquisition, the Company's S&P credit rating was CCC-. This was more than one notch below the Company's B- rating at the time Lone Star's acquisition was announced. Under the terms of the Indenture for the Junior Subordinated Notes, the Company or Lone Star would have been required to buy back the Notes unless it received an improved credit rating at the conclusion the ratings affirmation process described above.

52.     During the ratings affirmation process (which was conducted exclusively for the benefit of the Note Holders) Lone Star intentionally made false and misleading representations

or intentionally omitted material information that made Lone Star's representations false and misleading. Lone Star's false representations and omissions were made to S&P and the Note Holders for the specific purpose of manipulating the ratings affirmation process and for the purpose of obtaining an improved credit rating for Accredited. The specific false representations made by Lone Star are described with more particularity above but include materially false representations in Lone Star's 5-year plan representing that Lone Star intended to make $185 million in capital contributions to Accredited during the calendar year 2008. Lone Star's intentional false and misleading representations also include falsely representing to S&P and the Note Holders during the ratings affirmation process that Lone Star was committed to the long-term survival of Accredited when Lone Star's actions immediately following the credit affirmation process clearly demonstrate that Lone Star was most certainly not. Lone Star was also aware that the information supplied by it and the statements made by it would be used and/or considered for the specific purpose of assigning a credit rating to Accredited after the Company was acquired by Lone Star as required by the Indenture for the Junior Subordinated Notes. S&P and the Note Holders reasonably relied on Lone Star's intentionally false and misleading representations or omissions to the Note Holders' detriment. But for Lone Star's intentional and false representations and omissions, S&P would have issued the Company a CCC- credit rating or lower. This would have required the Company or Lone Star to repurchase the Notes. As a direct and proximate result of Lone Star's intentional and misleading omissions and representations, Lone Star was able to avoid repurchasing the Notes and was able to wrongfully retain funds for itself that were properly owed to the Note Holders. Lone Star benefited from its own wrongful conduct at the expense of the Note Holders. As a result, the Note Holders suffered significant damages as a result. Therefore, in accordance with equity and

good conscience, the Note Holders are entitled to restitution and/or damages related to Lone Star or the Company's failure to repurchase the Notes.

## Vicarious Liability

53.　　At all times discussed herein, Allen, Lipshy, Miller, Rea, Thomson and Velvin were acting in their capacity as officers of Lone Star Funds and affiliates of Lone Star. Accordingly, those entities, Lone Star Funds and affiliates of Lone Star, are vicariously liable for the conduct of Allen, Lipshy, Miller, Rea, Thomson and Velvin.

## Discovery Rule

54.　　To the extent applicable or necessary, the Plaintiff pleads the discovery rule and/or equitable tolling principles to any statute of limitations defense asserted by the Defendants.

## Jury Demand

Plaintiff requests that its claims be tried before a jury.

## Prayer for Relief

Plaintiff respectfully requests that this Court:

　　　　a.　　Order Lone Star to pay any and all monetary damages related to the Indenture and/or Lone Star or the Company's failure to repurchase the Notes, including, but not limited to, the payment of the outstanding principal amount of the Notes, any interest and/or default interest due under the Notes or the Indenture and related costs;

　　　　b.　　Award the Note Holders compensatory, punitive and exemplary damages to be determined at trial, including pre-judgment and post-judgment interest as permitted by law; and

c.     Award the Note Holders any other such relief, whether legal or equitable, that the Court deems just and proper.

Dated: February 24, 2010
      Wilmington, Delaware

Respectfully submitted,

**EDWARDS ANGELL PALMER & DODGE LLP**

By: /s/ Stuart M. Brown
    Stuart M. Brown (Bar No. 4050)
    R. Craig Martin (Bar No. 5032)
    919 North Market Street, Suite 1500
    Wilmington, Delaware 19801
    Telephone: (302) 777-7770
    Facsimile: (302) 777-7263
    Email: sbrown@eapdlaw.com
          rcmartin@eapdlaw.com

    -and-

    John Casais
    Matthew Martel
    EDWARDS ANGELL PALMER & DODGE LLP
    111 Huntington Avenue
    Boston, Massachusetts 02199
    Telephone: (617) 239-0100
    Facsimile: (617) 227-4420
    Email: jcasais@eapdlaw.com
          mmartel@eapdlaw.com

    -and-

W. Mark Lanier (Texas Bar No. 11934600)
Omar S. Saleh (Texas Bar No. 00797786)
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas  77069
Telephone:  (713) 659-5200
Facsimile:  (713) 659-2204
Email:  wml@lanierlawfirm.com
 oss@lanierlawfirm.com

*Attorneys for Plaintiff*

<u>OF COUNSEL</u>:

THE LANIER LAW FIRM, P.C.
6910 FM 1960 West
Houston, Texas  77069
Telephone:  (713) 659-5200
Facsimile:  (713) 659-2204