## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Accredited Home Lenders Holding Co., *et al.*, | Case No. 09-11516 (MFW) |
| Debtors. | Jointly Administered |
| Wells Fargo Bank, N.A., solely in its capacity as Indenture Trustee and Property Trustee, | |
| Plaintiff, | |
| v. | Adv. No. 09-53276 (MFW) |
| LSF5 Accredited Investments LLC, LSF5 Accredited Holdings, LLC, Lone Star Funds V (U.S.) L.P., Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, Len W. Allen, Jr., Marc L. Lipshy, Catharon Miller, Leigh Rea, Michael D. Thomson and Benjamin D. Velvin, III | |
| Defendants. | |

## CORRECTED* MEMORANDUM OF LAW IN SUPPORT OF
## THE LONE STAR DEFENDANTS' MOTION TO DISMISS THE AMENDED
## COMPLAINT FOR FAILURE TO STATE A CLAIM

Dated: April 29, 2010

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
John T. Dorsey (No. 2988)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600

---

* Please note that the caption of this Memorandum of Law has been corrected to reflect the fact that it has been filed in the United States Bankruptcy Court for the District of Delaware. The version of this Memorandum of Law originally filed on April 21, 2010 referred to the United States District Court for the District of Delaware. Other than the corrected caption, no modifications have been made to the Memorandum of Law originally filed on April 21, 2010.

**HOWREY LLP**
Walter M. Berger (pro hac vice)
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 787-1400
James G. Kress (pro hac vice)
1299 Pennsylvania Ave NW
Washington DC 20004
Kostas D. Katsiris (pro hac vice)
601 Lexington Avenue
New York, NY 10022

**VINSON & ELKINS LLP**
Josiah M. Daniel, III (pro hac vice)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Telephone: (214) 220-7718

**ATTORNEYS FOR DEFENDANTS**
**LSF5 Accredited Home Investments, LLC, LSF5 Accredited Holdings LLC, Lone Star Funds V (U.S.) L.P., Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, Len W. Allen, Jr., Marc L. Lipshy, Catharon Miller, Leigh Rea, Michael D. Thomson and Benjamin D. Velvin, III**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 6

       1.    The Accredited Trust Preferred Securities Transaction.............................. 6

       2.    The "Change of Control" Provisions ........................................................ 8

       3.    Lone Star's Acquisition of Accredited ...................................................... 8

       4.    The Post-Acquisition Ratings Affirmation Process and
            Alleged Misrepresentations ........................................................................ 10

       5.    Lone Star's Purported Omissions ............................................................. 13

       6.    The Accredited Bankruptcy and Related Litigation .................................. 13

ARGUMENT.................................................................................................................... 14

I.     THE SUFFICIENCY OF PLAINTIFF'S AMENDED COMPLAINT
      MUST BE JUDGED UNDER THE "PLAUSIBILITY" STANDARD
      AND THE HEIGHTENED PLEADING REQUIREMENTS
      APPLICABLE TO CLAIMS BASED ON ALLEGED
      MISREPRESENTATIONS ...................................................................................... 14

II.    NEW YORK LAW APPLIES TO PLAINTIFF'S CLAIMS ........................................... 16

III.   PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUDULENT
      MISREPRESENTATION................................................................................... 17

     A.    The Essential Elements of a Claim for Fraudulent
          Misrepresentation................................................................................... 17

     B.    Plaintiff Fails to Allege Any Actionable Misrepresentation or
          Omission ................................................................................................ 17

          1.    Plaintiff Improperly Attributes Misrepresentations by
               Accredited to Lone Star and Otherwise Fails to Satisfy the
               Specificity Requirements of Rule 9(b) ...................................... 17

          2.    Plaintiff Improperly Alleges Misrepresentations Involving
               Forward-Looking Statements....................................................... 19

          3.    Lone Star Had No Duty to Disclose the Information that
               Was Purportedly Fraudulently Omitted ...................................... 20

i

4.     Plaintiff Fails to Allege Facts Creating a Plausible and
"Strong Inference" of Fraudulent Intent ....................................................22

C.     Plaintiff Fails to Allege Reliance on Any Misrepresentation ...............................26

IV.    PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM
SHOULD BE DISMISSED ............................................................................................27

     A.     The Essential Elements of a Negligent Misrepresentation Claim .........................27

     B.     Plaintiff Fails to State a Claim for Negligent Misrepresentation..........................28

          1.     Plaintiff Fails to Allege any Actionable Misrepresentation
or Omission....................................................................................................28

          2.     Plaintiff Fails to Allege a "Special Relationship" Involving
Lone Star.......................................................................................................28

     C.     Plaintiff's Negligent Misrepresentation Claim Is Preempted by
New York's Martin Act ..............................................................................................29

V.     PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS
INTERFERENCE WITH CONTRACT ........................................................................31

     A.     The Essential Elements of a Tortious Interference Claim .....................................31

     B.     Plaintiff Fails to Allege That Lone Star's Alleged Interference
Resulted in any Breach of Contract .......................................................................31

     C.     Plaintiff Fails to Allege Lone Star Acted with the Requisite
Tortious Intent...........................................................................................................32

VI.    PLAINTIFF FAILS TO ALLEGE CRITICAL ELEMENTS OF ITS
QUASI-CONTRACTUAL CLAIMS OF PROMISSORY ESTOPPEL
AND UNJUST ENRICHMENT ....................................................................................33

     A.     Promissory Estoppel Only Applies Where Defendant Has Made A
Clear and Unambiguous Promise............................................................................33

     B.     Plaintiff's Claim for Unjust Enrichment Fails Because Plaintiff
Has Not Alleged that Defendants Were Enriched .................................................34

VII.   PLAINTIFF'S CONCLUSORY ALLEGATIONS AGAINST THE
INDIVIDUAL DEFENDANTS ARE INSUFFICIENT AS A MATTER
OF LAW .........................................................................................................................35

CONCLUSION.................................................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*50 Pine Co. v. CapitalSource Finance, LLC (In re 50 Pine Co.),*
    317 B.R. 276 (Bankr. S.D.N.Y. 2004)..................................................................33

*Abu Dhabi Committee Bank v. Morgan Stanley & Co. Inc.,*
    651 F. Supp. 2d 155 (S.D.N.Y. 2009).................................................17, 22, 30

*American Financial International Group-Asia, L.L.C. v. Bennett,*
    No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007).....................35

*Ashcroft v. Iqbal,*
    556 U.S. --, 129 S. Ct. 1937 (2009) ...................................14, 15, 23, 35

*Ashland Inc. v. Morgan Stanley & Co., Inc.,*
    No. 09 Civ. 5415, 2010 WL 1253932 (S.D.N.Y. April 1, 2010) ...............30, 33, 35

*Balakrishnan v. Kusel,*
    No. 08 Civ. 1440, 2009 WL 1291755 (E.D.N.Y. May 8, 2009).........................31

*Barron Partners, LP v. LAB123, Inc.,*
    593 F. Supp. 2d 667 (S.D.N.Y. 2009)..................................................................29

*Buck v. Hampton Township School District,*
    452 F.3d 256 (3d Cir. 2006)..................................................................................14

*In re Burlington Coat Factory Sec. Litigation,*
    114 F.3d 1410 (3d Cir. 1997).....................................................15, 17, 18

*Capricorn Investors III, L.P. v. Coolbrands Int'l., Inc.,*
    66 A.D.3d 409, 886 N.Y.S.2d 158 (N.Y. App. Div. 2009) .....................................28

*Castellano v. Young & Rubicam, Inc.,*
    257 F.3d 171 (2d Cir. 2001)..................................................................................30

*Cement & Concrete Workers District Council Welfare Fund, Pension Plan, Legal*
    *Servs. & Annuity Fund v. Lollo,*
    148 F.3d 194 (2d Cir.1998)..................................................................................27

*City of N.Y. v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425 (2d Cir. 2008), *rev'd in part on other grounds*, -- U.S. --, 130
    S.Ct. 983 (2010)..................................................................................................27

*Coan v. Tremont Advisors, Inc. (In re Vasu),*
    129 F. Supp. 2d 113 (D. Conn. 2001) ....................................................34

*Cohen v. Koenig,*
    25 F.3d 1168 (2d Cir. 1994) ...............................................................22

*Cohen v. Lehman Brothers Bank FSB,*
    273 F. Supp. 2d 524 (S.D.N.Y. 2003) ..................................................33

*Delcor Laboratories, Inc. v. Cosmair, Inc.,*
    169 A.D.2d 639, 564 N.Y.S.2d 771 (N.Y. App. Div.), *appeal denied,* 78
    N.Y.2d 952, 573 N.Y.S.2d 646 (N.Y. 1991) ...........................................29

*DiVittorio v. Equidyne Extractive Ind., Inc.,*
    822 F.2d 1242 (2d Cir. 1987) .......................................................17, 35

*Edwards v. MHS Holdings Corp.,*
    No. 90 Civ. 387, 1994 WL 383221 (N.D.N.Y July 15, 1994) ......................34

*Evercrete Corp. v. H-Cap Ltd.,*
    429 F. Supp. 2d 612 (S.D.N.Y. 2006) ..................................................27

*Faulkner v. Verizon Communications, Inc.,*
    189 F. Supp. 2d 161 (S.D.N.Y. 2002) ........................................25, 26, 37

*Felder v. Casey,*
    487 U.S. 131 (1988) ......................................................................16

*Fonar Corp. v. Magnetic Resonance Plus, Inc.,*
    957 F. Supp. 477 (S.D.N.Y. 1997) .....................................................32

*Frederico v. Home Depot,*
    507 F.3d 188 (3d Cir. 2007) .............................................................15

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.,*
    No. 04 Civ. 3318, 2005 WL 736217 (S.D.N.Y.), *aff'd* 159 Fed. Appx. 317 (2d
    Cir. 2005) ..................................................................................15

*Henneberry v. Sumitomo Corp. of America,*
    532 F. Supp. 2d 523 (S.D.N.Y. 2007) ..................................................27

*Hydro Investors Inc. v. Trafalgar Power, Inc.,*
    227 F.3d 8 (2d Cir. 2000) ...........................................................19, 28

*Ieradi v. Mylan Laboratories, Inc.,*
    230 F.3d 594 (3d Cir. 2000) .............................................................11

*Kassover v. UBS AG,*
    619 F. Supp. 2d 28 (S.D.N.Y. 2008).................................................................30

*Klaxon Co. v. Stentor Electric Manufacturing Co.,*
    313 U.S. 487 (1941).................................................................................16

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir.1991).........................................................................14

*Krynicki v. Penthouse Media Group, Inc. (In re General Media, Inc.),*
    368 B.R. 334 (Bankr. S.D.N.Y. 2007) ...........................................................32

*Lehman Brothers Commercial Corp. v. Minmetals International Non-Ferrous*
    *Metals Trading Co.,*
    179 F. Supp. 2d 159 (S.D.N.Y. 2001)............................................................30

*Lum v. Bank of America,*
    361 F.3d 217 (3d Cir. 2004)....................................................................6, 15

*Matsumura v. Benihana National Corp.,*
    542 F. Supp. 2d 245 (S.D.N.Y. 2008).........................................................19, 23

*Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France,*
    No. Civ.A. 19760-NC, 2004 WL 415251 (Del. Ch. Mar. 4, 2004) ........................18

*Millett v. Truelink, Inc.,*
    No. Civ. 05-599 SLR, 2006 WL 2583100 (D. Del. Sept. 7, 2006) ........................16

*Morris v. Castle Rock Entertainment, Inc.,*
    246 F. Supp. 2d 290 (S.D.N.Y. 2003).........................................................26, 27

*Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,*
    261 F.R.D. 13 (S.D.N.Y. 2009) ...............................................................21, 28

*Phillips v. County of Allegheny,*
    515 F.3d 224 (3d Cir. 2008).......................................................................14

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
    *Commerce,*
    No. 08 Civ. 8143, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ...........1, 11, 20, 25, 26, 36

*RMS Production Corp., v. Fridman,*
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)............................................................31

*River Glen Associates, Ltd. v. Merrill Lynch Credit Corp.,*
    295 A.D.2d 274, 743 N.Y.S.2d 870 (N.Y. App. Div. 2002) ....................................29

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.,*
    523 F. Supp. 2d 376 (S.D.N.Y. 2007)..............................................................34, 35

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris*
*Cos., Inc.,*
    75 F.3d 801 (2d Cir. 1996)..............................................................................23

*Siotkas v. LaboratoryOne, Inc.,*
    594 F. Supp. 2d 259 (E.D.N.Y. 2009) ................................................................27

*In re Sotheby's Holdings, Inc.,*
    No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .........................36

*Spirit Partners, L.P. v. audiohighway.com,*
    No. 99 Civ. 9020, 2000 WL 685022 (S.D.N.Y. May 25, 2000)............................30

*State of New York v. McLeod,*
    12 Misc.3d 1157(A), 819 N.Y.S.2d 213 (N.Y. Sup. Ct. 2006) .............................30

*Sun Microsystems, Inc. v. Versata Enterprises, Inc.,*
    630 F. Supp. 2d 395 (D. Del. 2009)..............................................................15, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)....................................................................................22, 26

*Tredennick v. Bone,*
    323 Fed. Appx. 103 (3d Cir. 2008) ..................................................................17

*Trevino v. Merscorp Inc.,*
    583 F. Supp. 2d 521 (D. Del. 2008)..................................................................18

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007)..........................................................................................18

*Williams v. Citigroup, Inc.,*
    No. 08 Civ. 9208, 2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009) ...........................31

*Winer Family Trust v. Queen,*
    503 F.3d 319 (3d Cir. 2007)..........................................................................23, 35

*Youkelsone v. Wash. Mutual, Inc. (In re Wash. Mutual, Inc.),*
    418 B.R. 107 (Bankr. D. Del. 2009) ..................................................................18

## STATUTES

15 U.S.C. § 80a-2 ..............................................................................................................7

17 C.F.R. § 230.501 ...........................................................................................................7

Fed. R. Civ. P. 8(a) ..........................................................................................................14

Fed. R. Civ. P. 9(b) ....................................................................................................*passim*

Fed. R. Civ. P. 12(f) .........................................................................................................22

Fed. R. Evid. 201 .............................................................................................................11

N.Y. Gen. Bus. Law § 352 ..............................................................................................30

N.Y. Gen. Bus. Law § 352-c ...........................................................................................30

Restatement (Second) of Conflict of Laws § 148 ...........................................................16

Defendants LSF5 Accredited Investments LLC, LSF5 Accredited Holdings LLC, Lone Star Funds V (U.S.) L.P., Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, and Individual Defendants Len W. Allen, Jr., Marc L. Lipshy, Catharon Miller, Leigh Rea, Michael D. Thomson, and Benjamin D. Velvin III (collectively referred to herein as "Lone Star" or the "Lone Star Defendants")[1] respectfully submit this Memorandum of Law in support of the Lone Star's Motion to Dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

This litigation represents one chapter in the voluminous history of the recent meltdown of the sub-prime mortgage industry, and the banking crisis and recession that followed. As such, Plaintiff's allegations regarding events from 2007 to 2009 must be viewed against the background of a financial calamity that saw numerous mortgage lenders, Wall Street banks, credit rating agencies, and others unable to anticipate and ill-prepared to respond effectively to this historic crisis.

Although Plaintiff's Amended Complaint seeks to disassociate its claim from the context of the sub-prime meltdown, in a recent analogous case dismissing fraud allegations in connection with losses on sub-prime mortgage investments, the Southern District of New York noted that "this action is not the first dispute to arise from the subprime mortgage crisis" and recognized that it could not weigh the plausibility of Plaintiff's fraud allegations without also considering the "unprecedented paralysis of the credit market and a global recession." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143, 2010 WL 961596, at ** 9, 11 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*").

---

[1] Although each of the institutional defendants is a separate legal entity with distinct operations and purposes, those distinctions are not pertinent to this motion to dismiss except where expressly noted. For purposes of this motion, it is sufficient to note that all Defendants share the same interests, posture and arguments mandating dismissal.

In this case, Plaintiff Wells Fargo Bank, N.A., acting in its capacity as Indenture Trustee and Property Trustee ("Plaintiff"), brings suit on behalf of disappointed investors ("Holders") in complex securities backed by a now-bankrupt sub-prime residential home mortgage loan lender, Accredited Home Lenders Holding Company ("Accredited" and the "Accredited Securities"). Accredited, which was acquired by Lone Star in October 2007, ceased making payments on the Accredited Securities in early 2009 when it joined the parade of sub-prime home mortgage lenders forced to file for bankruptcy protection as homeowner default rates grew and the secondary market for such mortgages disintegrated.

Like so many others, the Holders underestimated the risks of investing in sub-prime mortgages and suffered investment losses they now seek to recoup. Faced with the more limited recovery prospects of their pending bankruptcy claims against Accredited, the Holders have tried in vain to concoct tort and quasi-contractual claims sufficient to foist liability upon Lone Star, Accredited's solvent shareholder. Essentially the Amended Complaint alleges that:

- In January 2007, the Holders bought $56 million in Accredited Securities, as to which they acknowledged no public market existed;

- On June 4, 2007, Lone Star announced it would acquire Accredited;

- Following the October 11, 2007 closing, Lone Star realized that, pursuant to a "Change of Control" provision of the Accredited Securities, Accredited could be required to redeem the notes at par if Accredited's post-acquisition credit rating by Standard & Poor's ("S&P") deteriorated;

- Between late 2007 and early 2008, Lone Star schemed to avoid an S&P credit rating downgrade by making positive statements about its future plans for Accredited; having Accredited issue a set of forward-looking financial projections that later proved to be wrong; and failing to disclose certain information to S&P.

- As a result of these alleged misrepresentations and omissions, S&P issued an artificially inflated credit rating for Accredited, thereby preventing Holders from exiting their illiquid investment in the Accredited Securities.

According to Plaintiff, Lone Star's principal transgression came when, after completing the acquisition of Accredited, it made some, but not all, of the capital contributions to Accredited that were "promised" in the spreadsheet model of Accredited's five-year financial projections, and otherwise made positive comments regarding Accredited's prospects. Plaintiff alleges that "but for" those purported misrepresentations of Lone Star's future investment plans and statements of confidence in Accredited, and a handful of purported omissions having nothing to do with S&P's information requests, S&P most assuredly *would have* issued a credit rating for Accredited in 2008 that was much lower than the credit rating S&P had issued for Accredited in 2007, thereby triggering the Holders' opportunity to force the redemption of their Accredited Securities.[2]

Under the analytical framework for analyzing claims set forth by the Supreme Court in *Twombly* and *Iqbal*, the heightened pleading standards for claims that sound in fraud, and the substantive law of New York,[3] the Amended Complaint cannot withstand a motion to dismiss. The theory espoused is highly implausible; Plaintiff characterizes Lone Star's purported representations in a manner that is belied by the very documents attached to the Amended Complaint; and its claims suffer from numerous fatal pleading deficiencies, including the following:

**Fraudulent Misrepresentation**: Plaintiff fails to allege any actionable misrepresentation or omission by ***Lone Star***. The Amended Complaint focuses on a handful of statements issued by ***Accredited*** around the time of Lone Star's acquisition

---

[2] Given that Lone Star: (i) is not an issuer or guarantor of the Accredited Securities; (ii) is not a party to, nor had any involvement in, the transaction pursuant to which the Holders acquired the Accredited Securities; and (iii) made its own investment in Accredited, well after Holders' investment, and suffered its own losses on its Accredited investment along with Holders, Plaintiff's need to rely on an attenuated and implausible theory of liability should come as no surprise.

[3] As discussed in Section II, *infra*, under Delaware choice of law principles, New York law applies to Plaintiff's claims.

and selected elements of a forward-looking *Accredited* five-year plan that expressly warns that it relies on important underlying assumptions and disclaims any guarantee of future performance. Such statements of potential *future* conduct, however, cannot support a fraudulent misrepresentation claim unless Plaintiff plausibly alleges facts showing that such statements were false when made. The Amended Complaint fails to do so; indeed, the Amended Complaint's allegations more plausibly give rise to the opposite inference, *i.e.,* that Lone Star's acquisition of and post-acquisition infusion of $100 million of working capital into Accredited demonstrated its intent to support and rehabilitate Accredited, but that the continued deterioration of the sub-prime mortgage business ultimately proved too rapid and too strong to overcome with additional capital infusions.

Recognizing the glaring absence of any actionable representations by *Lone Star* that S&P could have relied upon in its rating of *Accredited*, Plaintiff chose to preemptively amend its original Complaint in a misguided effort to turn that fatal deficit to its advantage. Now, in contravention of the old adage that "silence is a virtue," Plaintiff argues that Lone Star *should have* made affirmative statements to S&P of a type that S&P *would have* relied upon, but alas, could not. Plaintiff's Amended Complaint thus cobbles together a few purported fraudulent "omissions" by Lone Star: (i) that Lone Star failed to disclose to S&P that Accredited's auditors were "in the process of issuing" a qualification on its audit report but ultimately decided not to do so; and (ii) that Lone Star failed to disclose that one of its unrelated acquisitions, the Bruno's grocery store chain, was "experiencing severe liquidity problems" and would "likely" result in hundreds of millions in legal exposure. Not only is the relevance of the alleged non-disclosures attenuated, but Plaintiff fails completely to plead, as it must, that Lone Star had a duty to make such disclosures to S&P or the Holders. Indeed, Plaintiff alleges no basis to suggest that S&P's information requests even encompassed the subject matter of the purported omissions.

**Negligent Misrepresentation**: As with its fraud claims, Plaintiff predicates its negligent misrepresentation claim solely on (a) statements that are promissory in nature or related to future events, or (b) purported omissions of facts that Lone Star had no duty to disclose. Neither the asserted misstatements nor omissions are sufficient to support a negligent misrepresentation claim as a matter of law. Further, these alleged negligent representations were made in the absence of the "special relationship of trust or confidence" between the Holders and Lone Star required by New York law. Indeed, Plaintiff has not alleged *any* direct or special relationship between *Lone Star* and the Holders; at most, Plaintiff's allegations reflect that an ordinary arm's-length business relationship between *Accredited* and the Holders existed. Finally, under New York's Martin Act, Plaintiff's negligent misrepresentation claims related to the Holders' frustrated redemption of securities are the exclusive province of the New York Attorney General's office, and not actionable by private parties.

**Tortious Interference With Contract**: Plaintiff's tortious interference claim is also premised on the alleged misrepresentations and omissions to S&P. It fails not only for the absence of any properly alleged tortious conduct or intent, as discussed above, but also for Plaintiff's failure to plead any breach of contract. While Plaintiff complains that Lone Star indirectly prevented the redemption of the Accredited Securities, there is no allegation that Accredited breached any contract with Holders, whether because of Lone Star's conduct or otherwise. The "Change of Control" provision at the core of Plaintiff's claims merely gave the Holders a right to obtain a private letter rating from S&P. Tellingly, Plaintiff complains about the S&P post-acquisition rating it received, not that it was unable to its exercise its contractual right to obtain one.

**Promissory Estoppel and Unjust Enrichment**: Plaintiff's late addition of quasi-contractual claims for promissory estoppel and unjust enrichment is a case of too little and too late. Plaintiff fails to allege the most basic elements of these claims. For example, Plaintiff has failed to allege that Lone Star made any "clear and unambiguous"

promise to Accredited or the Holders, without which there can be no claim for promissory estoppel. Likewise, Plaintiff does not allege that Lone Star received a "benefit" as a result of the alleged wrongdoing in this case. Indeed, not only is Lone Star the single largest creditor of Accredited, but Lone Star's failure to make additional capital infusions in the future — the gravamen of the Amended Complaint — cannot be equated with the receipt of an improper benefit.

## STATEMENT OF FACTS

### 1.    The Accredited Trust Preferred Securities Transaction

Until its bankruptcy filing in May 2009, Accredited was in the business of originating, financing, securitizing, servicing, and selling into the secondary market non-conforming residential home loans (*i.e.*, "sub-prime loans"). (Am. Compl. ¶ 15.) As Plaintiff acknowledges, and the Court may take judicial notice, the "sub-prime industry" had been experiencing adverse business conditions "since the end of 2006." (*Id.* ¶ 18.)

Accredited was not immune to these problems affecting its industry. In early 2007, Accredited sought to improve its liquidity position in a number of ways, including by raising $56 million through the issuance of a highly-complex form of debt instrument (the Accredited Securities). To do this, it entered into three related agreements on January 11, 2007: (i) an Amended and Restated Trust Agreement (the "Trust Agreement"); (ii) a Junior Subordinated Indenture (the "Indenture"); and (iii) a Purchase Agreement for the underlying debt (the "Purchase Agreement").[4] Pursuant to these three agreements, Accredited indirectly (*i.e.*, via a Delaware statutory trust) issued 56,000 Trust Preferred Securities, each having a stated liquidation amount of $1,000 and

---

[4] These three documents that make up the Accredited Securities are filed as Exhibits to the Declaration of Kostas D. Katsiris (cited to herein as "Katsiris Decl." or "Decl."). Courts may consider on a motion to dismiss documents that are integral to the complaint or that form the basis for plaintiff's claims. *See, e.g., Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (court may properly consider financial transaction agreements referenced in complaint and provided by defendants in support of their motion to dismiss).

providing for the payment of interest to the Holders until the redemption date.[5] (*Id.* ¶ 16;

Decl. Ex. 3 at 1.) These transactions are summarized in the diagram below:



\* Interest payments distributed through Delaware Statutory Trust.

\*\* Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., and JPMorgan Chase Bank, N.A. are successors in interest to Kodiak Warehouse LLC's and Kodiak Warehouse JPM LLC's interests in the 56,000 trust preferred shares.

These highly-complex Accredited Securities were sold only to the Holders, highly

sophisticated institutional investors who met the SEC's eligibility criteria for such

transactions.[6] Indeed, the Holders acknowledged at the time of purchase that "***no public***

---

[5] Although Plaintiff oversimplifies — and thereby mischaracterizes — the nature of the Accredited Securities transaction, Lone Star will not dispute that characterization except where pertinent to this Motion. In so doing, however, Lone Star does not concede the correctness of Plaintiff's description. For the sake of accuracy, the Trust Agreement, in essence, created the Trust that issued and sold the Accredited Securities to two purchasers of the securities – the Holders. The funds obtained by the Trust were then loaned to Accredited. (*See* Decl. Ex. 3 at 1-2.) In exchange, pursuant to the Indenture, Accredited issued a Junior Subordinated Note due 2037 (the "Note"), which provided that Accredited would make quarterly interest payments to the Holders until the stated maturity date in 2037. (*See* Decl. Ex. 2, Article II; Am. Compl. ¶ 16.)

[6] The Purchase Agreement required each Holder to be a sophisticated "accredited investor," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as well as a "Qualified Purchaser," as defined in Section 2(a)(51) of the Investment Company Act of 1940. *See* 17 C.F.R. § 230.501; 15 U.S.C. § 80a-2.

*market exists for any of the [Accredited] Securities* and that it is unlikely that a public market will ever exist for the Securities." (Decl. Ex. 3 at 11 (emphasis added).)

### 2. The "Change of Control" Provisions

Plaintiff's claims arise out of certain "Change of Control" provisions of the Accredited Securities. (*See, e.g.*, Am. Compl. ¶¶ 17, 32, 40.) These provisions required, among other things, that within thirty days of a "Change of Control," Accredited would initiate a "ratings affirmation process" with S&P to determine if a "Ratings Downgrade" had occurred. (Decl. Ex. 2, § 10.6(c).)[7] At the conclusion of the ratings affirmation process, S&P would issue to the Holders a new private letter rating for Accredited. (*Id.*)

The "Change of Control" provisions further provided that if S&P's post-acquisition rating reflected a "Ratings Downgrade," then the Holders could require (or attempt to require) Accredited to buy back the Accredited Securities. (Am. Compl. ¶ 17; Decl. Ex. 2, § 10.6(c).) A "Ratings Downgrade" was specifically defined to mean that S&P's post-acquisition rating of Accredited was "more than one (1) notch below [Accredited's] corporate credit rating prior to a Change of Control." (Decl. Ex. 2, § 1.1.)

### 3. Lone Star's Acquisition of Accredited

Shortly after issuing the Accredited Securities, Accredited announced that it, too, was experiencing liquidity problems due to the macroeconomic events adversely impacting the "sub-prime" mortgage industry since late 2006. (Am. Compl. ¶ 18.) In early 2007, Accredited took various steps to try to improve its financial situation, including seeking strategic partners with entities such as Lone Star, which specializes in the acquisition of distressed assets, including those related to residential loans. (Am.

---

[7] The definition of "Change of Control" in the Indenture is extremely specific. A "Change of Control" means: (i) the "direct or indirect sale, transfer, conveyance or other disposition of all or substantially all of the Company's assets" or stock constituting a majority of the voting interests; (ii) the consummation of certain transactions with a similar effect; or (iii) the adoption of a plan of liquidation or dissolution of the Company. (*See* Decl. Ex. 2, § 1.1.) For purposes of this Motion to Dismiss, Lone Star does not dispute that its acquisition of all of Accredited's equity in October 2007 constitutes a "Change of Control."

Compl. ¶¶ 2, 19.)

On June 4, 2007, Accredited and Lone Star entered into a merger agreement (the "Merger Agreement"), and on the same day, Lone Star and Accredited issued a joint press release announcing the contemplated merger. (*Id.* ¶¶ 24-25.) The press release acknowledged both the "current industry dynamics" plaguing the sub-prime industry and Lone Star's "record of helping companies like [Accredited] successfully address financial and operational challenges." (Am. Compl. Ex. 1.) The press release expressly cautioned that certain forward-looking statements in the press release, "including without limitation completion of the tender offer and merger *and any expected benefits of the merger*, constitute forward-looking statements within the meaning of the federal securities laws." (*Id.* (emphasis added).) Likewise, the press release expressly warned that "actual results . . . could differ materially from those projected in or contemplated by forward-looking statements," and otherwise expressly "caution[ed] readers that the non-prime mortgage industry and the Company's business are subject to numerous significant risks and uncertainties." (*Id.*)

On June 4, 2007, Lone Star also filed a tender offer statement with the SEC. (Am. Compl. ¶ 25.) It included, in pertinent part, an "Employee Communication" issued by Accredited to its employees. (Am. Compl. Ex. 2.) There, Accredited expressly acknowledged the challenges and "turbulent times" facing Accredited and its industry, including the failures of numerous of its competitors. (*Id.*) Like the press release, the Accredited Employee Communication cited by Plaintiff made no promises concerning Accredited's future financial performance.

After the Merger Agreement was entered, but prior to consummating the tender offer, Lone Star withdrew its offer to acquire Accredited, citing concerns over Accredited's deteriorating financial position. (Am. Compl. ¶ 28.) In response, Accredited sued Lone Star seeking specific performance of the Merger Agreement. (*Id.* ¶ 29.) The parties quickly settled this litigation, and on October 11, 2007, Lone Star

9

acquired the shares of Accredited, thereby triggering the "Change of Control" provisions of the Accredited Securities. (*See id.* ¶ 31; *see also* Press Release dated October 12, 2007, attached as Decl. Ex. 4.)

### 4. The Post-Acquisition Ratings Affirmation Process and Alleged Misrepresentations

By February 2008, at the request of the Holders, S&P was engaged in the ratings affirmation process, which included the issuance of information requests concerning Accredited. (Am. Compl. Ex. 3.) Plaintiff alleges that Lone Star and/or Accredited made the following misrepresentations in order to manipulate S&P's post-acquisition credit rating:

    i.    *Lone Star* made "favorable comments about Accredited in the public domain"; "indicated that it intended to remain in the sub-prime business with Accredited for the 'long haul'"; and otherwise made "favorable comments . . . in its public filings." (Am. Comp. ¶ 33.) These statements of optimism apparently occurred in October 2007, or at some point immediately following the "Change of Control." (*See id.* ¶¶ 32-33.)

    ii.    Lone Star and Accredited represented to the Holders and S&P that "Lone Star intended to support the Company through periodic and substantial capital contributions." (Am. Compl. ¶ 34.) For example, Plaintiff cites: (a) an alleged statement by an *Accredited* officer, Stuart Marvin, in January 2008 regarding future Lone Star capital contributions to Accredited, allegedly made with the authority of various of "Lone Star's officers" (*see id.*); (b) a March 4, 2008 "Standard & Poor's Questionnaire Responses," from *Accredited* (not Lone Star) indicating Lone Star's substantial capital contributions to date, and the fact that Lone Star considered its Accredited investment an important element of its residential mortgage strategy (Am. Compl. ¶ 35; Am Compl. Ex. 3); and (c) a May 14, 2008 conference call with S&P, during which *Accredited* and *unspecified "officials from Hudson"* conveyed Lone Star's intention to make capital contributions provided for in *Accredited's* 5-year financial projections, discussed below (Am. Compl. ¶ 35.)

    iii.    The *Accredited* 5-year financial plan supplied to S&P and the Holders some time late in the first quarter of 2008 included representations of future Lone Star financial support. According to Plaintiff, that Accredited plan called for future capital contributions from Lone Star from June through December 2008 that totaled $185 million. Also according to Plaintiff, the capital contributions depicted in the Accredited 5-year plan "essentially echoed *Lone Star's* oral

> representations to S&P and the . . . Holders that it had $200 million in 'dry powder' to contribute to Accredited during 2008." (Am. Compl. ¶ 36; Am. Compl. Ex. 4.) Plaintiff alleges that these oral representations were made during a conference call on November 1, 2007, just a few weeks after Lone Star acquired Accredited. (Am. Compl. ¶ 36.)

While Plaintiff submits only carefully screened materials in support of these allegations, even the information attached to the Amended Complaint paints a different picture. For example, in a March 4, 2008 email submitted by Plaintiff, Stuart Marvin of Accredited stated, *inter alia*, that since acquiring Accredited, Lone Star had "*contributed $100 million in additional [working] capital* into the Company beyond [Lone Star's] initial [$315 million] purchase of the company's common stock." (Am. Compl. Ex. 3 (emphasis added); *see also* Am. Compl. Ex. 4 at 20 (documenting "actual" capital investment of $100 million by Lone Star in January 2008).)

At the same time that Lone Star sought to support its investment in Accredited and stabilize its business, the financial challenges facing Accredited and other sub-prime lenders were growing – a situation that another court recently described as a "once-in-a-century credit tsunami."[8] The post-acquisition disclosures that Accredited made to S&P included important and obvious *caveats* to the forward-looking financial plans that they accompany. For example, in the March 2008 "Standard & Poor's Questionnaire

---

[8] *See CIBC*, 2010 WL 961596, at *9. It is well-settled that in deciding a Rule 12(b)(6) motion, a district court may properly consider matters of which judicial notice may be taken under Fed. R. Evid. 201. *See, e.g., Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000). As the *CIBC* court recently noted, the following facts regarding the economic conditions surrounding the sub-prime mortgage melt-down are the kinds of facts that can be judicially noticed for purposes of a court's "competing inference analysis": (1) in January 2008, the National Association of Realtors announced that 2007 had seen the largest drop in existing home sales in 25 years and the "first price decline in many, many years, possibly going back to the Great Depression;" (2) in March 2008, the Federal Reserve Bank of New York provided an emergency loan to try to avert a sudden collapse of Bear Stearns Companies, Inc., which had substantial exposure to mortgage-backed assets; (3) in July 2008, IndyMac Bank, a large originator of sub-prime mortgage loans, collapsed and was placed into conservatorship by the FDIC; and (4) on September 15, 2008, Lehman Brothers Holdings Inc., which had substantial exposure to mortgage-backed assets, filed for Chapter 11 bankruptcy protection. *Cf. CIBC*, 2010 WL 961596, at **7 n.2, 11. Lone Star likewise requests that the Court take judicial notice of these same facts, which are capable of accurate and ready confirmation by reference to numerous publicly available sources.

Responses" that Plaintiff attached to its Amended Complaint at Ex. 3, Accredited informed S&P that:

- "Accredited is currently working on completing a long-range business plan. The impact of the ongoing and unprecedented challenges in the mortgage market has delayed the completion. *The lack of transparency in the secondary markets for mortgage loans makes any long-range planning a challenging task in today's environment;*" and

- "[Accredited's] objective today is to produce high quality loans while preserving liquidity *until the return of a viable secondary market for loans*. Accredited *resumed* originating loans on a *very limited and selective* basis in November 2007."

(Am. Compl. Ex. 3 (emphasis added).) Likewise, the spreadsheet model containing the Accredited five-year financial projections provided to S&P (*see* Am. Compl. ¶ 35), contained the following straightforward disclosures:

- "The preparation of financial projections requires the use of significant estimates and assumptions. These estimates and assumptions affect the reported amounts of assets, liabilities, revenues and expenses during the projected periods. Although the estimates and assumptions are based on historical experience and various other factors, *the actual results may differ from the estimates and assumptions used in these projections, and such difference may be material.*"

- "*These financial projections are not a guarantee of future performance and do not require Accredited nor its affiliated entities to take any action assumed in these projections.* Accredited and its affiliated entities take no responsibility to update these estimates and assumptions for actual results that may vary from the estimate or assumption used in these financial projections."

(Am. Compl. Ex. 4 (emphasis added).)

Plaintiff alleges that Lone Star ultimately did not make "the majority" of the forecasted capital contributions, after it had already voluntarily poured $100 million of working capital into Accredited in early 2008. (Am. Compl. ¶ 39; Am. Compl. Ex. 4 at 20.) Plaintiff does not and could not allege, however, that the "5-year plan" was anything other than (a) a forward-looking financial *projection* issued by Accredited for a period in which the sub-prime mortgage market effectively collapsed, (b) which was accompanied

by unambiguous disclosures stating, *inter alia*, that the projections were not "guarantee[s] of future performance" and that actual results could materially differ from the projections, and (c) which expressly disclaimed any obligation for Accredited or its affiliated entities "to take any action assumed in these projections." (Am. Compl. Ex. 4 at 1.)

### 5. Lone Star's Purported Omissions

Plaintiff also alleges that Lone Star manipulated the ratings process by failing to disclose three pieces of information to S&P and the Holders that would have "undoubtedly" altered the credit ratings process. (Am. Compl. ¶ 37.) First, Lone Star allegedly failed to disclose in March 2008 that Accredited's auditors "were in the process of" issuing an audit report that contained a "going concern" qualification but that the auditor did not do so because Lone Star falsely told the auditor that Lone Star intended to provide considerable financial support to Accredited. (*Id.*) Second, Lone Star purportedly failed to disclose that "at least one of [Lone Star's] largest affiliates (Bruno's Holdings LLC) was experiencing severe liquidity problems" and could not continue to operate without significant capital contributions from Lone Star. (*Id.*) Finally, Lone Star allegedly failed to disclose that Lone Star would "likely" have hundreds of millions of dollars of legal exposure in connection with its Bruno's investment. (*Id.*)

### 6. The Accredited Bankruptcy and Related Litigation

On May 1, 2009, as Accredited could no longer meet its obligations and the prospects for a turn-around in the sub-prime mortgage business became more distant, Accredited filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. (Am. Compl. ¶ 39; Decl. Ex. 5.) A few days later, the Holders filed an objection in that bankruptcy proceeding based on their interests in the

Accredited Securities,[9] and on November 16, 2009, Plaintiff, on behalf of the Holders, filed claims in the Accredited bankruptcy proceeding seeking recovery under the Accredited Securities.[10]  On December 23, 2009, Plaintiff brought this direct action against Lone Star, seeking to hold it also responsible for Holders' losses on the Accredited Securities.

## ARGUMENT

I.    **THE SUFFICIENCY OF PLAINTIFF'S AMENDED COMPLAINT MUST BE JUDGED UNDER THE "PLAUSIBILITY" STANDARD AND THE HEIGHTENED PLEADING REQUIREMENTS APPLICABLE TO CLAIMS BASED ON ALLEGED MISREPRESENTATIONS**

To satisfy Fed. R. Civ. P. 8(a) Plaintiff must allege facts that, taken as true, would establish every element of the claims asserted. *See, e.g., Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).  The Supreme Court has elaborated: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . .  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. --, 129 S. Ct. 1937, 1949-50 (2009).  A claim is "plausible" for purposes of a motion to dismiss only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[9] Specifically, on May 6, 2009, three entities — Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., and JPMorgan Chase Bank, N.A. — filed an objection in the Delaware Bankruptcy Court. *See* Omnibus Objection of Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., and JPMorgan Chase Bank, N.A. to the Various First Day Motions of Debtors ("Kodiak Objection"), attached as Decl. Ex. 5.  On a Rule 12(b)(6) motion, courts routinely consider "items subject to judicial notice [and] matters of public record . . . ." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quotation omitted); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").

[10] *See* Verified Statement of Wells Fargo Bank, National Association, as Indenture Trustee, Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, attached as Decl. Ex. 6.

misconduct alleged." *Id.* at 1949 (quotation omitted). Thus, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

Moreover, where, as here, each of Plaintiff's claims is based on allegedly fraudulent misrepresentations, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In the Third Circuit, this requires the plaintiff to "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). A plaintiff must also allege "who made a misrepresentation to whom and the general content of the misrepresentation." *Lum*, 361 F.3d at 224 (citation omitted). In other words, the plaintiff must allege at a minimum the identity of the speaker, when and where the statements were made, and how those statements were improper, that is, the "who, what, when, where, and how" of the alleged misrepresentation. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (citations omitted). These same heightened pleading requirements apply to Plaintiff's claims of negligent misrepresentation, tortious interference, promissory estoppel, and unjust enrichment, as those claims are predicated on the same conduct constituting the alleged fraud. *See, e.g., Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 405 (D. Del. 2009) (Rule 9(b) applies to claims "sound[ing] in fraud" such as negligent misrepresentation); *see also Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318, 2005 WL 736217, at *2 (S.D.N.Y. 2005), *aff'd* 159 Fed. Appx. 317 (2d Cir. 2005) ("Fed. R. Civ. P. 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary." (quotation omitted)).

## II.   NEW YORK LAW APPLIES TO PLAINTIFF'S CLAIMS

Delaware choice of law principles determine the applicable state law in this case. *See Felder v. Casey*, 487 U.S. 131, 151 (1988); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Delaware uses the Restatement (Second) of Conflict of Laws Section 148 to determine which law governs fraud claims and the other claims at issue here based on alleged misrepresentations. *See Millett v. Truelink, Inc.*, No. 05 Civ. 599, 2006 WL 2583100, at *3 (D. Del. Sept. 7, 2006); Restatement (Second) of Conflict of Laws § 148, cmt. a (1971).

Applied to this case, Section 148 of the Restatement identifies three factors (out of six total) that the court should consider in determining the applicable state law: (1) the place where the representations were relied on; (2) the place where the representations were received; and (3) the place where the representations were made. Here, the relevant representations — the purported misrepresentations made by Lone Star and/or Accredited to S&P — were made by individuals located primarily in Texas (Lone Star employees) or California (Accredited employees). More importantly, however, all of the relevant misrepresentations and omissions were received and relied on by S&P in New York.

In substantially identical situations, Delaware courts have applied the law of the state where the representations were received and acted upon, here New York. *See Millett*, 2006 WL 2583100, at **3-4 (applying Kansas law where it was "clear that plaintiffs received and acted in reliance on defendant's representations in Kansas"); *see also* Restatement (Second) of Conflict of Laws § 148, cmt. j (the state where the representations were both received and acted upon is usually the state whose law governs). Notably, this outcome squares with Plaintiff's agreement made in the Accredited Securities that "[t]his indenture and the rights and obligations of each of the Holders, the Company and the Trustee shall be construed and enforced in accordance with and governed by the laws of the State of New York . . . ." (Decl. Ex. 2, § 1.11.)

# III. PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUDULENT MISREPRESENTATION

## A. The Essential Elements of a Claim for Fraudulent Misrepresentation

To state a fraudulent misrepresentation claim under New York law, "a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009). As discussed above, Fed. R. Civ. P. 9(b) requires the Plaintiff to plead specifically the "who, what, when, where and how" of the alleged misrepresentation. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1422.

## B. Plaintiff Fails to Allege Any Actionable Misrepresentation or Omission

### 1. Plaintiff Improperly Attributes Misrepresentations by Accredited to Lone Star and Otherwise Fails to Satisfy the Specificity Requirements of Rule 9(b)

Throughout the Amended Complaint, Plaintiff conflates statements by Accredited with those of Lone Star and seeks to attribute to Lone Star the alleged statements of Accredited.[11] To the contrary, however, a complaint must specify the particular role each defendant played in the alleged fraud. *Tredennick v. Bone*, 323 Fed. Appx. 103, 105 (3d Cir. 2008); *see also DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("[T]he complaint should inform *each* defendant of the nature of *his* alleged participation in the fraud.") (emphasis added).

---

[11] For example, Plaintiff alleges that "Lone Star also confirmed its purported long-term commitment to Accredited" in a March 4, 2008 email to S&P and the Holders. (Am. Compl. ¶ 34.) Plaintiff even describes the email as originating from Lone Star. (*Id.*) But the email in question, attached as Ex. 3 to Plaintiff's Amended Complaint, was sent by Stuart Marvin, who is identified in the Amended Complaint as *Accredited's* Executive Vice President and Secretary – *not* a Lone Star employee. (*Id.*; Am. Compl. Ex. 3.)

In this case, Plaintiff simply assumes that Lone Star, as Accredited's parent, is liable for Accredited's actions. However, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiary." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 43 (2007) (quotation omitted).[12] The Amended Complaint includes no allegations sufficient to rebut Delaware's presumption of corporate separateness in this case.[13]

With respect to the few allegedly direct statements by Lone Star, the Amended Complaint is noticeably sparse on details. First, Plaintiff makes generalized allegations that Lone Star made "favorable comments about Accredited in the public domain," that Lone Star "indicated that it intended to remain in the sub-prime business with Accredited for the 'long haul'", and that Lone Star represented to S&P and the Holders that "Lone Star intended to support the Company through periodic and substantial capital contributions." (Am. Compl. ¶¶ 33-34; *see also id.* ¶¶ 35, 42.) These vague allegations do not satisfy the "who, what, when, where, and how" test. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1422.

Next, Plaintiff alleges that as part of the ratings affirmation process, Accredited submitted a 5-year plan that showed capital contributions from Lone Star in 2008 that "essentially echoed" purported oral representations by Lone Star to S&P regarding the "dry powder" it could invest in Accredited. (Am. Compl. ¶ 36.) The only additional

---

[12] Under Delaware law, to overcome the presumption of separateness between parent and subsidiary, Plaintiff must allege "(1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *See Trevino v. Merscorp Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008). Purely conclusory allegations do not suffice to plead the prerequisites of such a veil-piercing theory. *See Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France*, No. Civ.A. 19760-NC, 2004 WL 415251, at *3 (Del. Ch. Mar. 4, 2004).

[13] *See Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*, 418 B.R. 107, 113 (Bankr. D. Del. 2009) ("[A] court sitting in Delaware must look to the state of incorporation of a company to determine whether the relationship between the corporate entity and its stockholders can give rise to liability of the stockholders for the conduct of the corporate entity."). Accredited and the various Lone Star entities are Delaware corporations, and therefore Delaware law should apply to Plaintiff's ill-conceived attempt at veil-piercing.

information supplied by Plaintiff with respect to these purported oral representations is that "the Debtor and the Lone Star affiliates" made them on a single conference call that occurred on November 1, 2007 – several months before the projections themselves were issued. (*Id.*; *see also* Am. Compl. Ex. 4 (showing date of April 9, 2008 for projections).) Tellingly, despite amendment, Plaintiff again fails to satisfy the "who, what, when, where, and how" test. (*Id.*) Indeed, Plaintiff has failed to identify a single Lone Star employee who said *anything* in connection with these projections, much less how they were misleading in this context.

### 2. Plaintiff Improperly Alleges Misrepresentations Involving Forward-Looking Statements

Even assuming that Plaintiff could attribute Accredited's statements to Lone Star and could otherwise be deemed to have satisfied Rule 9(b), Plaintiff's fraud claim would fail because "predictive or opinion statements about future events, without more, are not misrepresentations" under New York law. *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008); *see also Hydro Investors Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 21 (2d Cir. 2000).

All of Plaintiff's alleged affirmative misrepresentations are predictive statements about *future* events and Lone Star's *expectations and intentions* for the future. (*See, e.g.,* Am. Compl. ¶ 33 ("intended to remain in the sub-prime business"); *id.* ¶ 34 ("intended to support [Accredited]").) Because each alleged misrepresentation concerns how Lone Star *expected to* perform in the future, Plaintiff has failed to allege a claim of fraudulent misrepresentation under New York law. *See Matsumura*, 542 F. Supp. 2d at 252-54.

For example, Plaintiff attempts to characterize the Accredited 5-year plan as a "*represent[ation] that Lone Star would make* significant capital contributions" (Am. Compl. ¶ 35 (emphasis added)), and affirmatively alleges that Lone Star failed to make the "contributions that *it promised* in its 5-year plan." (*Id.* ¶ 39 (emphasis added).) But the 5-year plan states on its face that it is necessarily premised on certain assumptions

and that its projections are *"not a guarantee of future performance* and *do not require* Accredited nor its affiliated entities *to take any action assumed in these projections."* (Am. Compl. Ex. 4 at 1 (emphasis added).) Indeed, it is recognized as a matter of law that such predictive financial models are not actionable as fraud simply because they prove inaccurate or do not come to pass. Notably, the allegedly "promised" capital infusions are divined from one line in a complex model that projected sales, revenues, dispositions, costs, and other highly subjective predictions of Accredited's future operations. In a similar context, the *CIBC* court reasoned:

> Even assuming the [Valuation Model] was neither forward-looking nor accompanied by appropriate cautionary language, Plaintiff cannot show the [Model's] calculations were both objectively and subjectively false. *See In re Salomon Smith Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005) ("The Court rejects plaintiffs' characterization of valuation models as 'fact' rather than 'opinion.'"). . . . One cannot reasonably conclude that, because the [Model's] calculations were mistaken, Defendants had the subjective intent to defraud.

*CIBC*, 2010 WL 961596, at *11. If anything, Plaintiff's attempt to transform **Accredited's** statements of possible future conduct, accompanied by express disclaimers and warnings, into guarantees or promises by **Lone Star** to take such actions underscores Plaintiff's recognition of its Achilles heel.

### 3. Lone Star Had No Duty to Disclose the Information that Was Purportedly Fraudulently Omitted

Recognizing the infirmity of tort claims based on forward-looking projections and other non-binding statements of future intent, Plaintiff amended its original Complaint to add allegations that Lone Star failed to disclose facts related to (1) the conduct of Accredited's independent auditor and (2) financial difficulties and litigation exposure at Bruno's Holdings LLC, a grocery store chain that Lone Star owned, and claims that such facts "would have undoubtedly altered the credit ratings process if disclosed." (Am. Compl. ¶ 37.) Even putting aside Plaintiff's effort to move away from alleged statements actually made and allegedly relied upon to a theory of liability premised on statements

never made and never relied upon, Plaintiff falls far short of adequately alleging that Lone Star owed S&P or the Holders a duty to reveal the allegedly omitted information.

Plaintiff's pre-emptive effort to fill the void in its Amended Complaint is futile — under New York law, a duty to disclose arises only in three circumstances:

> a.   When there is a fiduciary or confidential relationship between the parties. *See, e.g., Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 (S.D.N.Y. 2009). Plaintiff has not alleged any fiduciary or confidential relationship between Lone Star and S&P or the Holders, nor could it. *See* Section IV.B.2., *infra.*

> b.   When one party is acting on superior knowledge not readily available to the other in connection with a business transaction and knows that the other is acting on the basis of mistaken knowledge. *Musalli Factory*, 261 F.R.D. at 23. Here, however, even if Lone Star had superior knowledge with respect to Bruno's and/or Accredited's auditor's decision *not* to issue a qualified opinion, there is not a single allegation that Lone Star knew that S&P or the Holders were focusing on this information. Indeed, the information requests sent by S&P that are highlighted by Plaintiff expressly stated that all of the information it requested "would be needed on Accredited," not on Lone Star or Bruno's. (Am. Compl. Ex. 3.) Further, these requests do not refer to any audit whatsoever. Thus, Plaintiff's "failure to disclose" theory is implausible on its face.

> c.   When there is a need to complete or clarify one party's partial or ambiguous statement. *Musalli Factory*, 261 F.R.D. at 23. But Plaintiff has failed to plead any facts whatsoever that would allow one to draw the reasonable inference that Lone Star discussed Bruno's or the results of any audit with S&P or the Holders or otherwise needed to "clarify" information concerning these or any other subjects.

Finally, Lone Star's investment in Bruno's — a grocery store chain — is completely irrelevant to this dispute. Plaintiff makes no allegation whatsoever that S&P ever asked about Bruno's (or about any of the other numerous companies in which the Lone Star entities own an interest, for that matter). In addition, its speculative allegations about potential exposure from the Bruno's dispute are based solely on an unsubstantiated complaint rather than a judgment, settlement, or any other document of substance.

Plaintiff's desperate attempt to drag allegations about an unrelated and totally irrelevant company into this case is, at best, immaterial and impertinent.[14]

Plaintiff's theory of fraud by omission is therefore not viable under New York law, and its allegations concerning that theory are implausible under *Iqbal.*

### 4. Plaintiff Fails to Allege Facts Creating a Plausible and "Strong Inference" of Fraudulent Intent

Plaintiff has also fallen far short of adequately alleging facts showing that Lone Star did not intend to make any future contributions reflected in Accredited's 5-year plan at the time those projections were made. *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made."). Likewise, there are no facts supporting a finding of fraudulent intent with respect to the purported omissions claimed by Plaintiff.

The elements of common law fraud under New York law are "substantially identical" to those under federal securities law. *Abu Dhabi*, 651 F. Supp. 2d at 171 (applying standards announced in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), to common law fraud claim governed by New York law). Thus, the knowledge or "scienter" element encompasses either "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* In *Tellabs,* the Supreme Court explained that an inference of fraudulent intent must be "cogent and compelling, *thus strong in light of other explanations.*" 551 U.S. at 324 (emphasis added). *Tellabs* further directs lower courts to consider alternative or competing inferences, including exculpatory inferences, when determining whether plaintiffs had alleged adequately a "strong inference" of fraud. *See id.* at 310.

---

[14] Accordingly, this Court should strike all allegations relating to Bruno's under Fed. R. Civ. P. 12(f).

Here, Plaintiff's allegations of scienter fall into one of two categories, both of which are plainly insufficient to raise the required "strong inference" of scienter. First, the allegations concerning Lone Star's state of mind are nothing more than thinly veiled conclusions that should not be credited. (*See, e.g.*, Am. Compl. ¶ 42 ("Lone Star's false representations and omissions were made intentionally and willfully, with a conscious disregard for the rights of the Note Holders").) Conclusory allegations such as this are simply insufficient as a matter of law. *Iqbal*, 129 S.Ct. at 1949.

Second, the Amended Complaint includes allegations that are impermissible attempts to plead "fraud by hindsight." (*See, e.g.*, Am. Compl. ¶ 42 (alleging that Lone Star claimed to be "committed to the long-term survival of Accredited when Lone Star's actions immediately following the credit affirmation process clearly demonstrate that Lone Star was most certainly not."); *see also id.* ¶ 40 ("It is clear that Lone Star created financial projections sufficient to avoid a credit rating downgrade, but that Lone Star had no intention of actually making the capital contributions . . . .").) A plaintiff may not use statements by defendants "predicting a prosperous future and [then hold] them up against a backdrop of what actually transpired." *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) (dismissing fraud claim where allegations of defendant's false statements "regarding its pursuit of its traditional marketing strategy, results of sales, and expected 1993 earnings" constituted an impermissible theory of fraud by hindsight). [15]

The Amended Complaint fails to sufficiently allege facts establishing a "strong inference" that Lone Star had no intention of making future capital infusions into Accredited at the time those projections were made. *See Matsumura*, 542 F. Supp. 2d at 255. By contrast, the Amended Complaint *does* plead facts showing that Accredited acknowledged the problems of its industry and the lack of transparency regarding the

---

[15] The same is true in the Third Circuit. *See Winer Family Trust v. Queen*, 503 F.3d 319, 331-32 (3d Cir. 2007) ("We have long rejected attempts to plead fraud by hindsight" (quotation omitted)).

credit markets, and the very document embodying the financial projections expressly warned that the forecasts were based on "estimates and assumptions" and that they were "not a guarantee of future performance" by Accredited or Lone Star. (Am. Compl. Ex. 4 at 1.) Under these circumstances, the most plausible inference to be drawn is that the forecasts were issued in good faith at the time they were made.

Plaintiff's allegations of fraudulent intent actually give rise to a much stronger inference that efforts to turn around Accredited did not come to fruition because of the rapid deterioration in the sub-prime mortgage market. Stripped of Plaintiff's empty accusations, the Amended Complaint tells a straightforward story:

> (i) Lone Star acquired a financially troubled Accredited in October 2007 and, by March 2008, had "contributed $100 million in additional working capital into the Company beyond [Lone Star's] initial purchase of the company's common stock" (Am. Compl. Ex. 3);

> (ii) in March 2008, as part of the ratings affirmation process, Accredited expressly warned S&P, among other things, that there were "ongoing and unprecedented challenges in the mortgage market" and that "[t]he lack of transparency in the secondary markets for mortgage loans makes any long-range planning a challenging task in today's environment" (*Id.*);

> (iii) as part of that ratings affirmation process, neither Lone Star nor Accredited ever made any guarantee concerning Accredited's future performance; indeed, Accredited expressly warned that the financial projections it supplied S&P were *not* a guarantee of future performance (Am. Compl. Ex. 4 at 1); and

> (iv) operating in steadily worsening economic conditions, Accredited's business (and that of the sub-prime mortgage business generally) did not improve during 2008, and on May 1, 2009, Accredited ultimately filed for bankruptcy, joining the long list of banks, sub-prime lenders and major Wall Street institutions that failed as result of the sub-prime market collapse. (Am. Compl. ¶ 39); *see also* note 8, *supra.*

Notably, the story of the speed with which the sub-prime mortgage market unraveled between 2007 and 2009, and the failure of investors and credit rating agencies to fully appreciate the consequences thereof, has appeared numerous times in the pages of the

*Wall Street Journal* and countless other newspapers. As the Southern District of New York held in rejecting similar claims over exposure to sub-prime investments:

> Under the *Tellabs* "comparative" inquiry, the inference Plaintiff asks this Court to draw from CIBC's statements must be considered against "cogent" and "compelling" alternative explanations for a deficiency. *See* 551 U.S. at 323-24. The Complaint describes an unprecedented paralysis of the credit market and a global recession. Major financial institutions like Bear Stearns, Merrill Lynch, and Lehman Brothers imploded as a consequence of the financial dislocation. Looking back, a full turn of the wheel would have been appropriate. That CIBC chose an incremental measured response, while erroneous in hindsight, is as plausible an explanation for the losses as an inference of fraud. *See In re PXRE Group*, 600 F. Supp. 2d at 546. CIBC, like so many other institutions, could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight . . . .

*CIBC*, 2010 WL 961596, at *11. Viewed against this background, Lone Star's inability to forecast its ultimate inability to help Accredited ride out the sub-prime tsunami hardly establishes a "strong" or "plausible" inference of fraud on the part of Lone Star.

The Amended Complaint's allegations of fraud are also similar to those considered and rejected in *Faulkner v. Verizon Communications, Inc.*, 189 F. Supp. 2d 161 (S.D.N.Y. 2002). There, Verizon entered into a merger agreement with NorthPoint in 2000, for a transaction expected to close in 2001. Prior to closing, Verizon made a $150 million capital contribution to NorthPoint, and made public statements that the merger was "on track." *Id.* at 165. Later in 2000, however, NorthPoint reported losses that were worse than had been previously disclosed. Verizon opted out of the merger in November 2000, and NorthPoint filed for bankruptcy. *Id.* at 165-66.

The plaintiffs in *Verizon* were holders of NorthPoint's debt. As is the case here, the NorthPoint debt securities contained a "change in control" provision requiring NorthPoint to re-purchase the notes plus accrued interest. *Id.* at 163. When the merger fell through, the NorthPoint debt holders filed a securities fraud suit, alleging that Verizon decided to opt out of the merger in favor of forcing NorthPoint into bankruptcy

so that Verizon could acquire NorthPoint on more favorable terms. *Id.* at 165, 167. The district court dismissed the complaint with prejudice:

> [P]laintiffs' theory is contradicted by the other particularized facts concerning Verizon's actions with respect to the Merger Agreement. Most importantly, on September 6, 2000, Verizon provided NorthPoint with $150 million in funding. . . . Verizon's partial performance of its obligations under the Merger Agreement, which required the expenditure of a significant amount of capital, lends strong support to the position that Verizon initially intended to perform under the contract.

*Id.* at 171.

Similarly, in this case, Plaintiff admits that Lone Star, a company specializing in distressed assets, had spent $315 million to acquire Accredited, with the expressed goal of turning it around. (Am. Compl. ¶ 34; Am. Compl. Ex. 3.) Likewise, Lone Star's voluntary post-acquisition contribution of an additional $100 million in working capital to Accredited "lends strong support to the position that [Lone Star] initially intended to" support Accredited's operations and to support its own substantial investment therein. *Verizon*, 189 F. Supp. 2d at 171. In the face of these undisputed facts, Plaintiff's allegations of fraud are *neither* "cogent and compelling" or "strong in light of other explanations" arising from the unprecedented collapse of the sub-prime mortgage market. *Tellabs,* 551 U.S. at 324; *see also CIBC*, 2010 WL 961596, at *11.

## C. Plaintiff Fails to Allege Reliance on Any Misrepresentation

To adequately allege the reliance element under New York law, the alleged misrepresentation must influence the conduct of the *plaintiff*, not the conduct of a *third party*, even where the third-party's reliance is alleged to have caused harm to the plaintiff. In the case of *Morris v. Castle Rock Entm't, Inc.*, 246 F. Supp. 2d 290 (S.D.N.Y. 2003), the plaintiff predicated its fraud claim on defendant's alleged misrepresentations to an arbitration panel which led to an arbitration ruling in defendant's favor. *Id.* at 296. The district court dismissed the complaint, stating that "[a] plaintiff cannot state a claim for fraud based on a third party's reliance on a misrepresentation,

even when it was made to influence the third party foreseeably to act in a manner detrimental to the plaintiff." *Id.* (quotations omitted). Similarly, in this case, any alleged misrepresentations made by Lone Star that influenced the ratings affirmation process could only have been *relied on by S&P*, not by the Holders, and thus, cannot support Plaintiff's claim of fraud on behalf of the Holders.[16]

## IV. PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED

### A. The Essential Elements of a Negligent Misrepresentation Claim

To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *See Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 538 (S.D.N.Y. 2007). Where, as here, plaintiff's negligent misrepresentation claim is based on the same set of facts upon which plaintiff's fraud claim is grounded, that claim must be pleaded with particularity pursuant to Rule 9(b). *Sun Microsystems, Inc.*, 630 F. Supp.

---

[16] *See, e.g., City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008), *rev'd in part on other grounds*, -- U.S. --, 130 S.Ct. 983 (2010) (allegations that misrepresentations directed at the State or consumers caused financial harm to City were predicated on third-party reliance, and, as such, were insufficient to make out a common law fraud claim under New York law); *Cement & Concrete Workers Dist. Council Welfare Fund Pension Plan, Legal Servs. & Annuity Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) (explaining "that a plaintiff does not establish the reliance element . . . by showing only that a third party relied on a defendant's false statements"); *Siotkas v. LabOne, Inc.*, 594 F. Supp. 2d 259, 276 (E.D.N.Y. 2009) (airline employees, who lost their jobs after drug testing company reported test results to the airline, could not claim fraudulent misrepresentation against testing company because they did not rely on the testing company's false statements); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 628 (S.D.N.Y. 2006) (defendant did not commit common law fraud upon competitor as result of its allegedly false representation to the Patent and Trademark Office, even if the PTO issued registration of that mark based on the misrepresentation, absent an allegation that the competitor itself ever relied on any misrepresentation).

2d at 405. Plaintiff's allegations fail to satisfy these pleading and substantive requirements for several reasons.

### B.    Plaintiff Fails to State a Claim for Negligent Misrepresentation

#### 1.    Plaintiff Fails to Allege any Actionable Misrepresentation or Omission

Plaintiff's claim for negligent misrepresentation should be dismissed because all of the alleged misrepresentations refer to (i) statements of possible future conduct, which are not actionable as negligent misrepresentations, *see, e.g., Hydro Investors,* 227 F.3d at 20-21, or (ii) omissions of purported facts that Lone Star had no duty to disclose, *see* Section III.B.3., *supra.*

As with the fraud claims discussed above, where, as here, the alleged negligent misrepresentations concern future expectations, courts have not hesitated to dismiss those claims at the pleadings stage. *See, e.g., Capricorn Investors III, L.P. v. Coolbrands Int'l., Inc.,* 66 A.D.3d 409, 409, 886 N.Y.S.2d 158 (N.Y. App. Div. 2009) (plaintiff's allegations that defendants failed to keep oral promises to take future actions were held not actionable).

Moreover, Plaintiff's claim of negligent misrepresentation faces an additional hurdle — it cannot be premised on omissions where no allegations support a duty to disclose the information purportedly withheld. *See, e.g., Musalli Factory,* 261 F.R.D. at 28 (dismissing claim of negligent misrepresentation by nondisclosure where there was no showing of a duty to disclose the information); *see also* Section III.B.3, *supra.* Under these well-settled principles of New York law, Plaintiff's claim for negligent misrepresentation must be dismissed.

#### 2.    Plaintiff Fails to Allege a "Special Relationship" Involving Lone Star

Plaintiff's negligent misrepresentation claim fails because the allegations in the Amended Complaint do not support a finding of a "special relationship of trust or

28

confidence" between the Holders and Lone Star, as required by New York law. *See Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009). Under New York law, a claim for negligent misrepresentation can only stand if there are allegations of a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another. *See Delcor Labs., Inc. v. Cosmair, Inc.*, 169 A.D.2d 639, 639-40, 564 N.Y.S.2d 771 (N.Y. App. Div.) *appeal denied*, 78 N.Y.2d 952, 573 N.Y.S.2d 646 (N.Y. 1991). Of particular importance to our case, New York law is clear that allegations of an arm's-length business relationship between sophisticated commercial entities are *not* enough to demonstrate a "special relationship" for pleading purposes. *See, e.g., River Glen Assocs., Ltd. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275, 743 N.Y.S.2d 870, 871 (N.Y. App. Div. 2002).

Here, Plaintiff has not and cannot plead any special relationship between the Holders and **Lone Star**. Plaintiff alleges only that the Holders held securities whose payments were backed by Accredited, a company that Lone Star purchased *after* those securities were issued. (*See* Am. Compl. ¶¶ 16, 31.) Indeed, the rights of the Holders were expressly governed by detailed transaction documents that were negotiated, prepared, and executed *before* Lone Star acquired Accredited. (*See* Decl. Exs. 1, 2, & 3.)

Accordingly, because Plaintiff cannot allege anything more than an arms' length relationship defined by contract with **Accredited**, and no "special" or "direct" relationship with **Lone Star,** as Accredited's shareholder and parent corporation, Plaintiff's negligent misrepresentation claim should be dismissed.

### C.   Plaintiff's Negligent Misrepresentation Claim Is Preempted by New York's Martin Act

Regardless of whether Plaintiff has alleged the requisite facts to support a negligent misrepresentation claim, because the alleged representations arise in connection with the Holders' potential redemption of the Accredited Securities, it is barred by Article 23-A of the New York General Business Law (the "Martin Act"). The Martin Act makes

it unlawful to, *inter alia*, use or employ "any fraud, deception, concealment, [or] suppression . . . where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities . . . ." N.Y. Gen. Bus. Law § 352-c(1).[17] Under the Act, the New York Attorney General possesses the exclusive power to regulate the sale of securities.[18] *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001). As a result of this grant of exclusive jurisdiction, private claims brought directly under the statute and "common-law claims based on facts that provide the Attorney General grounds for instituting an action under the Act" are disallowed. *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001).

The vast majority of state and federal courts that have considered the scope of Martin Act preemption have held that it bars securities-related common law claims that do *not* require proof of scienter, *i.e.*, claims that do not require "proof of deceitful intent," such as negligent misrepresentation. *See, e.g., Kassover v. UBS AG*, 619 F. Supp. 2d 28, 37 (S.D.N.Y. 2008) (dismissing common law claims for negligent misrepresentation as

---

[17] For the Martin Act to apply, the claims must be based on conduct that is "within or from" New York. The Martin Act therefore applies here because it cannot be disputed that a "substantial portion of the events" giving rise to Plaintiff's claims occurred in New York, including the ratings affirmation process that is central to all of Plaintiff's claims. *See, e.g., Abu Dhabi*, 651 F. Supp. 2d at 181-82. For the same reason, venue would have been proper in New York under 28 U.S.C. § 1391(a) had Plaintiff filed suit there, which provides an independent rationale for the application of the Martin Act. *See Ashland Inc. v. Morgan Stanley & Co., Inc.*, No. 09 Civ. 5415, 2010 WL 1253932, at *16 (S.D.N.Y. April 1, 2010) ("[W]here venue is appropriate in New York, the Martin Act will apply and preempt the state law claims."). Finally, Plaintiff specifically contemplated and agreed that New York law would apply to any claims arising out of the Accredited Securities. (Decl. Ex. 2, § 1.11.)

[18] Plaintiff's negligent misrepresentation claim clearly involves a "security" within the meaning of the Martin Act. N.Y. Gen. Bus. Law § 352(1). Moreover, Plaintiff's claims, which involve the Holders' right to redeem their securities, are well within the purview of the broad interpretation of the Martin Act's phrase "issuance, distribution, exchange, sale, negotiation or purchase" of securities. *See Spirit Partners, L.P. v. audiohighway.com*, No. 99 Civ. 9020, 2000 WL 685022, at *6 (S.D.N.Y. May 25, 2000) (dismissing negligent misrepresentation claim as precluded by the Martin Act where claims arose out of the sale, and subsequent redemption, of securities); *see also State of New York v. McLeod*, 12 Misc.3d 1157(A), at *4, 819 N.Y.S.2d 213 (N.Y. Sup. Ct. 2006) (the plain language of the Martin Act allows for its application "regardless of whether issuance, distribution, exchange, sale, negotiation or purchase [actually] resulted.")

preempted by the Martin Act). Accordingly, Plaintiff's claim of negligent misrepresentation also fails due to Martin Act preemption.

## V.    PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

### A.    The Essential Elements of a Tortious Interference Claim

To state a claim for tortious interference with contract under New York law, a plaintiff must properly allege: (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting from the breach. *See, e.g., Williams v. Citigroup, Inc.*, No. 08 Civ. 9208, 2009 WL 3682536, at *8 (S.D.N.Y. Nov. 2, 2009). Plaintiff has failed to allege the required elements of intent and actual breach of a contract.

### B.    Plaintiff Fails to Allege That Lone Star's Alleged Interference Resulted in any Breach of Contract

Applying New York law, courts in the Second Circuit require the plaintiff to "identify a specific contractual term that was breached." *Balakrishnan v. Kusel*, No. 08 Civ. 1440, 2009 WL 1291755, at *11 (E.D.N.Y. May 8, 2009) (quotation omitted); *see also RMS Prod. Corp., v. Fridman*, 643 F. Supp. 2d 382, 409 (S.D.N.Y. 2009) (dismissing a claim of tortious interference because it was unclear how the defendant's actions "actually violated the terms" of the agreement at issue). The only contractual provision Plaintiff specifically identifies is the "Change of Control" provision. That provision required Accredited[19] to repurchase "the Notes if the Company was acquired

---

[19] The language concerning an "acquirer's" purported obligations did not appear in the initial Complaint and was added to the Amended Complaint. But simply stating that an acquirer (as opposed to Accredited) would be bound by the Indenture does not make it so. In fact, the terms of the Accredited Securities reject Plaintiff's interpretation. (*See, e.g.*, Decl. Ex. 2, § 8.2.)

and the acquisition was accompanied by a drop in the Company's credit rating of more than one 'notch.'" (Am. Compl. ¶ 17.) The non-contingent contractual obligation, however, "consist[ed] only of [Accredited] cooperating with the holders of the Preferred Securities in obtaining a private letter rating from S&P." (Decl. Ex. 2, § 10.6(c).) Thus, even assuming, *arguendo*, that S&P's ratings analysis was influenced by Lone Star's alleged statements and omissions, there is simply no allegation in the Amended Complaint that S&P, Accredited, or anyone else breached a contractual provision as a result.

At best, Plaintiff has alleged that Lone Star's actions somehow made Accredited's obligations under the Indenture "more difficult or impossible to perform." (Am. Compl. ¶ 47.) New York courts have expressly found that a claim for tortious interference with contract cannot be predicated on such a theory. *See, e.g., Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 480-81 (S.D.N.Y. 1997). As Plaintiff has failed to allege an actual breach of contract, its claim for tortious interference with contract must be dismissed.

### C.    Plaintiff Fails to Allege Lone Star Acted with the Requisite Tortious Intent

Finally, Plaintiff alleges that "Lone Star intentionally induced Accredited to breach its obligations under" the contracts at-issue. (Am. Compl. ¶ 47.) Under New York law, to sustain a claim of tortious interference that is based upon alleged fraudulent conduct, as here, a defendant must satisfy the requirements of Fed. R. Civ. P. 9(b) and state the circumstances constituting the fraud with particularity. *See, e.g., Krynicki, v. Penthouse Media Group, Inc. (In re General Media, Inc.)*, 368 B.R. 334, 344 (Bankr. S.D.N.Y. 2007). As discussed above, to the extent that any alleged statements can be attributed to Lone Star, Plaintiff fails to allege facts – as opposed to bare legal conclusions – that Lone Star made those statements with the requisite intent.

## VI. PLAINTIFF FAILS TO ALLEGE CRITICAL ELEMENTS OF ITS QUASI-CONTRACTUAL CLAIMS OF PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT

Unable to bring a claim for breach of contract against Lone Star, which is neither a party to nor an obligor under the Accredited Securities, Plaintiff is left to grasp for claims under quasi-contractual theories of promissory estoppel and unjust enrichment. Plaintiff's efforts in this regard are to no avail.

### A. Promissory Estoppel Only Applies Where Defendant Has Made A Clear and Unambiguous Promise

To state a claim for promissory estoppel, a plaintiff must allege (1) that a clear and unambiguous promise was made, (2) the Plaintiff reasonably and foreseeably relied upon this promise, and (3) the Plaintiff sustained an injury by reason of his reliance. *Cohen v. Lehman Bros. Bank FSB*, 273 F. Supp. 2d 524, 529 (S.D.N.Y. 2003). In this case, Plaintiff has failed to allege that Lone Star made a clear and unambiguous promise.

Plaintiff specifically identifies only two possible "promises": (1) a promise in Lone Star's 5-year plan to make $185 million in capital contributions to Accredited during the calendar year 2008 (Am. Compl. ¶¶ 35, 36); and (2) a promise during the ratings affirmation process that Lone Star was committed to the long-term survival of Accredited. (*Id.* ¶ 34.) The first of these so-called "promises" was actually a forecast, which as discussed above expressly cautioned the reader that there were no guarantees of future performance. New York courts regularly dismiss claims for promissory estoppel involving such cautionary language. *See, e.g., Cohen*, 273 F. Supp. 2d at 527, 530-31 (dismissing claim that a loan application was a promise to loan funds because it contained the disclaimer that it was "NOT A COMMITMENT BY LENDER TO LEND"); *50 Pine Co. v. CapitalSource Fin., LLC (In re 50 Pine Co.)*, 317 B.R. 276, 285 (Bankr. S.D.N.Y. 2004) (dismissing claim where alleged assurances to lend were subject to lender's option to lend "at its sole discretion"); *see also Ashland*, 2010 WL 1253932, at *15 (dismissing a claim of promissory estoppel based on alleged guarantees that investments would be

liquid because they were accompanied by cautionary statements and hence were not sufficiently clear and unambiguous promises).

Defendant's alleged second promise, a commitment to Accredited's "long-term" survival, is too indefinite to survive a motion to dismiss. Plaintiff's allegations neither define the phrase "long term," nor tie any specific obligations to the phrase "commitment to [Accredited's] survival." Such vague statements, lacking details, cannot support a claim for promissory estoppel. *See Coan v. Tremont Advisors, Inc. (In re Vasu)*, 129 F. Supp. 2d 113, 121 (D. Conn. 2001) (dismissing a claim under New York law because it lacked an "ascertainable term of duration"); *Edwards v. MHS Holdings Corp.*, No. 90 Civ. 387, 1994 WL 383221, at *6 (N.D.N.Y July 15, 1994) (dismissing a claim of promissory estoppel based on a quotation of expected market value of stock because it was not a sufficiently clear and unambiguous promise).

Because Plaintiff has plainly failed to allege a "clear and unambiguous" promise to do anything, its claim for promissory estoppel must be dismissed.

### B. Plaintiff's Claim for Unjust Enrichment Fails Because Plaintiff Has Not Alleged that Defendants Were Enriched

To state a claim for unjust enrichment, Plaintiff must allege (1) that Defendants were enriched, (2) at Plaintiff's expense and (3) that in equity and good conscience, the Defendants should return the property at issue. *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007). But Plaintiff alleges in conclusory fashion only that "Lone Star was able to avoid repurchasing the Notes and was able to wrongfully retain funds for itself that were properly owed to the Note Holders. Lone Star benefited from its own wrongful conduct at the expense of the Note Holders." (Am. Compl. ¶ 52.)

Plaintiff's boilerplate allegations of "enrichment" fail not only because they have not been plead with the requisite detail under Fed. R. Civ. P. 9(b), but also because they are illogical. Lone Star is not a party to the Accredited Securities, nor has Plaintiff cited

a single provision therein establishing any Lone Star obligations. Any obligation to repurchase the Accredited Securities would have fallen on Accredited alone and, even if funds were "retained," they were retained by Accredited, not by Lone Star or any of the individual defendants. Courts routinely dismiss claims of unjust enrichment where, as here, there is no pleading that any defendant has been *enriched*. *See Russian Standard Vodka*, 523 F. Supp. 2d at 385-86 (dismissing unjust enrichment claim because plaintiff's theory of enrichment was "illogical"); *American Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at **3-4 (S.D.N.Y. June 14, 2007) (dismissing claim for unjust enrichment where allegations did not demonstrate how any defendant was personally enriched).[20]

## VII. PLAINTIFF'S CONCLUSORY ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS ARE INSUFFICIENT AS A MATTER OF LAW

As discussed more fully above, Plaintiff's allegations against the individual defendants must also satisfy the requirements of Rules 8 and 9(b). *See, e.g., Iqbal*, 129 S.Ct. at 1949 ("[A] complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."); *Winer Family Trust*, 503 F.3d at 335 (allegations against officers and directors in the context of "group-published documents" must establish that each such officer or director had such a degree of "day-to-day control or involvement in regular company operations" to justify a presumption that misrepresentations in the document are attributable to that individual officer or director); *see also DiVittorio*, 822 F.2d at 1248-49 (Rule 9(b) was not satisfied as to an individual defendant where the complaint failed to tie in a "specific way" that individual to the offering memorandum in question, to allege that such individual was an officer or

---

[20] Plaintiff's claim for unjust enrichment is also preempted by New York's Martin Act for the reasons discussed above in Section IV, C. *See Ashland*, 2010 WL 1253932, at **16-17 (dismissing claim for unjust enrichment).

director at the time it was issued, and to allege "particular facts demonstrating the knowledge of the [individual] at the time that . . . statements [in the offering memorandum] were false.").

Plaintiff makes only three allegations specifically directed at the individual defendants: that (1) before making representations concerning Lone Star's intentions to make future capital contributions to Accredited, an executive of Accredited indicated that he was speaking on behalf of each of the individual defendants, none of whom was present (Am. Comp. ¶ 34); (2) the individual defendants, as officers and directors, in some unspecified way, contributed to Accredited's 5-year projections and reviewed them and knew them to be false (*id.* ¶ 35); and (3) the alleged misrepresentations and omissions related to an audit of Accredited were made with the "knowledge and consent" of the individual defendants. (*Id.* ¶ 37.) None of these blanket, boilerplate allegations satisfies Rule 9(b)'s requirements because in each case it fails to (i) identify which Lone Star entity was involved with each statement or document in question, and (ii) set forth sufficient facts to establish that any particular individual defendant had such a degree of day-to-day control or involvement in the regular operations of that Lone Star entity to justify attributing any alleged misrepresentation in that statement or document to that particular individual defendant. As the *CIBC* court held, "[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight." *CIBC*, 2010 WL 961596, at *10; *see also In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." (citations omitted)). Plaintiff's allegations against the individual defendants for fraudulent misrepresentation, negligent misrepresentation, and tortious interference with contract should therefore be dismissed.

Further, Plaintiff makes no allegation that any individual defendant made any "clear and unambiguous promise" to the Holders. Nor does it allege that any individual defendant was "unjustly enriched" at the Holders' expense. Plaintiff's claims against the individual defendants for promissory estoppel and unjust enrichment should therefore be dismissed.

Given the utter lack of any specific, individualized facts that would tie any of the individual defendants (much less all of them) to any of the Plaintiff's claims, it is clear that these claims against the individual defendants were added to the Amended Complaint for purposes of sheer harassment. For the reasons discussed immediately above, as well as all of the reasons discussed elsewhere in connection with the allegations against Lone Star generally, Plaintiff's allegations against the individual defendants must be dismissed.

## CONCLUSION

Plaintiff and Lone Star each incurred significant investment losses brought about by the demise of Accredited. While those losses were "substantial and regrettable," Plaintiff supplies "no proper legal basis for shifting its loss to" Lone Star. *Verizon*, 189 F. Supp. 2d. at 174. As in *Verizon*, both Plaintiff and Lone Star "were betting on the survival and success of" Accredited, and both of them lost. *Id.* Although Plaintiff blames Lone Star for the Holders' losses, the far more compelling inference to be drawn from Plaintiff's allegations is that in the face of a financial crisis that claimed as victims scores of home mortgage lenders, neither Lone Star, the Holders nor S&P were able to predict the speed and power with which the sub-prime industry would implode. Accordingly, after two attempts, Plaintiff's failure to present specific, plausible, factual allegations sufficient to support shifting its losses to Lone Star compels that all claims be dismissed in their entirety with prejudice.

Dated: April 29, 2010

Respectfully submitted,
**YOUNG CONAWAY STARGATT &
TAYLOR LLP**
By: /s/ John T. Dorsey
John T. Dorsey (No. 2988)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801-1037
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jdorsey@ycst.com

**HOWREY LLP**
Walter M. Berger (pro hac vice)
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 787-1400
Email: bergerc@howrey.com
James G. Kress (pro hac vice)
1299 Pennsylvania Ave NW
Washington DC 20004
Email: kressj@howrey.com
Kostas D. Katsiris (pro hac vice)
601 Lexington Avenue
New York, NY 10022
Email: katsirisk@howrey.com

**VINSON & ELKINS LLP**
Josiah M. Daniel, III (pro hac vice)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Telephone: (214) 220-7718
Email: jdaniel@velaw.com

**ATTORNEYS FOR DEFENDANTS
LSF5 Accredited Home Investments
LLC, LSF5 Accredited Holdings LLC,
Lone Star Funds V (U.S.) L.P., Hudson
Advisors LLC, Lone Star U.S.
Acquisitions LLC, Len W. Allen, Jr.,
Marc L. Lipshy, Catharon Miller, Leigh
Rea, Michael D. Thomson and Benjamin
D. Velvin, III**